Doe LANG, Petitioner,

v.

**RETIREMENT LIVING PUBLISHING CO., INC., Respondent.**

**RETIREMENT LIVING PUBLISHING CO., INC., Plaintiff,**

v.

Doe LANG, Defendant.

Nos. 89 Civ. 3868 (LLS), 89 Civ. 3959 (LLS).

United States District Court, S.D. New York.

March 4, 1991.

Cowan, Liebowitz & Latman, P.C., New York City, for Retirement Living Pub. Co., Inc.; David Goldberg and Richard S. Mandel, of counsel.

Richard A. Altman, Brooklyn, N.Y., for Doe Lang.

## OPINION AND ORDER

STANTON, District Judge.

This case arises over the use of the words "New Choices" in both the name of a publishing company owned by Doe Lang and a magazine published by Retirement Living Publishing Co., Inc., ("Retirement Living").

In May 1989, Dr. Lang, who owns New Choices Press, sought an injunction pursuant to New York General Business Law section 133 against Retirement Living using the name NEW CHOICES for its magazine, NEW CHOICES FOR THE BEST YEARS. Retirement Living removed that action from the state court to this court, and filed a countersuit under the Lanham Act, 15 U.S.C. §§ 1051–1128 (1988), for a declaration that it was entitled to use its name. Dr. Lang's motions for a preliminary and permanent injunction and for summary judgment were denied. No. 89 Civ. 3868 (S.D.N.Y. Nov. 6, 1989) (the "Opinion"), aff'd, No. 89–9206 (2d Cir. Feb. 16, 1990) (unpublished summary order).

Discovery is now complete, and Retirement Living moves for summary judgment pursuant to Fed.R.Civ.P. 56.

## BACKGROUND

The material facts in this action are not in dispute (although the parties dispute their significance) and they are substantially as they were at the time of the Opinion.

### 1. New Choices Press

In 1985 Dr. Lang started a publishing company called New Choices Press to publish materials in what can be broadly described as the "self-help" field. Its main asset was Dr. Lang's already-published book *The Secret of Charisma: What It Is and How to Get It*, in which she explains how to develop charisma.

Dr. Lang had planned to expand New Choices Press to include publications on other subjects. Those plans have not materialized, and since 1985 it has sold Dr. Lang's book and several cassette tapes on charisma. Those products are not aimed at any specific age group, and she does not consider them to compete against magazines.

The Press' sales through late 1989 total approximately $85,000. About half the sales were through Publisher's Group West, and they have steadily declined since the first year Dr. Lang's book was issued, to $4,400 in 1988. Sales made directly by New Choices Press in response to orders it receives have consistently been less than $2,000 a year.

During discovery Dr. Lang produced about 33 advertisements and articles referring to her and her products. Only about 11 of those refer to New Choices Press. Many mention Charismedia, Inc., which is Dr. Lang's other company.

## 2. Retirement Living's Magazine

In January 1988 Retirement Living, a subsidiary of The Reader's Digest Association, purchased 50 PLUS, a magazine for mature readers. Management decided to change 50 PLUS' name and, after some discussion, tentatively selected NEW CHOICES FOR THE BEST YEARS.

Retirement Living's search for other users of "New Choices" revealed Dr. Lang's company. One of Retirement Living's lawyers visited and telephoned Dr. Lang's business in July 1989 and reported that New Choices Press was one of two businesses located in an apartment owned by Dr. Lang, a teacher of public speaking and effective self-presentation. The lawyer reported that New Choices Press published a book and a tape set, neither of which was entitled NEW CHOICES.

Since Dr. Lang did not publish a magazine and it seemed unlikely that her small business, run from her apartment, had developed sufficient source identification to preempt all uses of the words "New Choices," Retirement Living decided it could use NEW CHOICES FOR THE BEST YEARS. It was advised by counsel that there was no likelihood of confusion between its magazine and New Choices Press.

The magazine NEW CHOICES FOR THE BEST YEARS has over 580,000 subscribers, and it claims hundreds of letters each month from satisfied customers. It aims at mature readers, primarily those between the ages of 45 and 65.

An October 1990 trademark search revealed 168 federal applications * for trademarks of publications using the words CHOICE or CHOICES. It also showed a number of state registrations and common-law uses of the words in publications.

## 3. Confusion

In late 1988 Dr. Lang's office began to receive telephone calls intended for NEW CHOICES FOR THE BEST YEARS. Ms. Lang contacted the telephone company in an attempt to straighten out the apparent confusion, but the calls continued.

NEW CHOICES FOR THE BEST YEARS' telephone number was first listed in August 1989. From September 11, 1989 to May 31, 1990 Dr. Lang and her staff received no calls intended for NEW CHOICES FOR THE BEST YEARS, according to notes they kept.

In late May 1990, Retirement Living changed its telephone number, and Dr. Lang again received misdirected telephone calls. Retirement Living attributes those calls to a telephone company failure to direct callers to its new number, and claims that the failure has been remedied. However, Dr. Lang asserts that she has continued (at least up until late December 1990, shortly before her papers opposing this motion were filed) to receive calls for Retirement Living.

Dr. Lang has also received a few letters intended for Retirement Living, including complaints about a Retirement Living advertisement and a subscriber's failure to receive a subscription.

## DISCUSSION

### A. *Summary Judgment*

Under Fed.R.Civ.P. 56(c), summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "Summary judgment is appropriate when, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the nonmoving party."

* Whether registered, pending, cancelled, abandoned or of other status.

*Lund's, Inc. v. Chemical Bank*, 870 F.2d 840, 844 (2d Cir.1989).

If a motion for summary judgment is properly supported, "the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)).

### B. *The Polaroid factors*

 The issue in a trademark infringement case is whether there is "any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978) (per curiam), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). That determination requires a review of the factors (discussed below) set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). In a trademark case, summary judgment is appropriate where there is no genuine dispute about the facts material to the *Polaroid* analysis, and those facts could lead to only one reasonable conclusion. *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 876–77 (2d Cir.1986). *See also Brown v. Quiniou*, 744 F.Supp. 463, 467 (S.D.N.Y.1990).

### 1. Strength of the mark

 The strength of a mark is "its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979). Although the parties agree that the mark NEW CHOICES is suggestive and thus entitled to protection, a suggestive mark's strength must be analyzed in its commercial context. *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 76 (2d Cir.1988). Here, the indisputable evidence shows that Dr. Lang's mark is weak.

The extensive third-party use of the words "Choice" or "Choices" in the titles of publications, together with the prosaic wording and arrangement of Dr. Lang's mark, shows its weakness. *See Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1005–06 (2d Cir.1983). It "is extremely unlikely that prudent consumers will confuse it with similar marks on noncompetitive goods." *Id.* at 1006.

In addition, Dr. Lang's business is limited, with only about $85,000 in sales since 1985. The title of Dr. Lang's book, which does not contain those words, appears in about 33 advertisements and articles, only third of which mention New Choices Press. Such limited media coverage and marketing does not raise a genuine issue of material fact about whether Dr. Lang's mark has acquired any secondary meaning. There is simply no evidence from which a factfinder could conclude that the public at large associates the term "New Choices" with Dr. Lang's business or her products, particularly when used as NEW CHOICES FOR THE BEST YEARS.

### 2. Similarity of the Marks

This factor focuses on whether the two marks convey the same general impression when viewed separately, and whether the similarity is likely to confuse the public. *Hasbro*, 858 F.2d at 77; *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 492 (2d Cir.1988).

The parties have agreed to the following description of their marks:

Retirement Living's mark NEW CHOICES FOR THE BEST YEARS is placed prominently at the top of the magazine cover, set in two sizes of typeface with NEW CHOICES in large hollow slanted letters and FOR THE BEST YEARS in smaller block print set off by lines above and below and with a small square between each of the words.

Lang's mark NEW CHOICES PRESS is set in small plain block letters, all of the same size, above a sun and pedestal design and placed on the spine of her book, "The Secret of Charisma."

(Consent Pretrial Order Agreed Findings of Fact ¶¶ 11–12).

As stated in the Opinion, "There is some similarity of these two marks, but considering differences in ' "size, layout, design, and logotype of the two titles" ', there seems to be little chance that consumers will confuse them. [*Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1226 (2d Cir.1987) (quoting *C.L.A.S.S. Promotions Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir.1985)).]" Opinion at 7.

### 3. Proximity of the products

■ Retirement Living publishes a magazine aimed at mature adults, and Dr. Lang produces a book and tapes on charisma. While the parties are both in the general field of publishing, it is undisputed that they publish different products and target distinct audiences. Therefore, their products are not proximate. *See ibid.* (magazines aimed at black Americans not proximate where one was directed at West Indians and where "physical attributes and layouts of the magazines are clearly distinguishable."). *See also McGregor*, 599 F.2d at 1134–35 (district court did not err in determining that inexpensive golf jackets and expensive coats are not proximate); *Buitoni Foods Corp. v. Gio. Buton & C.S. P.A.*, 680 F.2d 290, 292–93 (2d Cir.1982) (different alcoholic beverages are only slightly proximate); *Inc. Publishing Corp. v. Manhattan Magazine, Inc.*, 616 F.Supp. 370, 381–85 (S.D.N.Y.1985) (noting different "editorial content, style, geographical distribution and audience appeal" between two business magazines), *aff'd*, 788 F.2d 3 (2d Cir.1986) (table).

### 4. Bridging the gap

This factor "looks to whether the senior user of the mark is likely to enter the market in which the junior user is operating." *Centaur*, 830 F.2d at 1227.

At the time of the Opinion, Dr. Lang asserted that she was seeking investors for an expansion of her publishing activities to include a series of guides and a newsletter. Neither plans nor investors have material-ized. She has not produced any other evidence of expansion. Her plans to bridge the gap remain wholly speculative, and do not present a genuine issue of material fact on this aspect.

### 5. Actual confusion

Dr. Lang contends that the misdirected telephone calls and letters she has received show that the public is confused as to the origins of the parties' products.

However, the callers were not seeking New Choices Press, but rather the publisher of NEW CHOICES FOR THE BEST YEARS. The misdirected calls, standing alone, do not indicate consumer confusion about the source of products, but only that when individuals sought Retirement Living's telephone number they erroneously found and used Dr. Lang's. *See Inc. Publishing*, 616 F.Supp. at 388–89; *Cinnabar Traders Ltd. v. Cinnabar Lane, Ltd.*, 223 U.S.P.Q. 726, 728, 1983 WL 687 (S.D.N.Y. 1983); *Programmed Tax Sys., Inc. v. Raytheon Co.*, 439 F.Supp. 1128, 1131 (S.D.N.Y.1977) (inquiry regarding relationship between plaintiff and defendant is not evidence of actual confusion).

That conclusion is supported by the fact that the calls stopped from the time Retirement Living's telephone listing was published until it changed its telephone number. Significantly, there is no evidence that Retirement Living receives calls for New Choices Press.

The few letters for Retirement Living that Dr. Lang received do not raise a material issue whether there is a likelihood of confusion. As with the misdirected telephone calls, those letters show only that their writers used an incorrect address when trying to reach Retirement Living. *See Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3d Cir. 1978) (nineteen misdirected letters between 1976 and 1979 are "extremely minimal evidence" of consumer confusion). *See also Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118–19 n. 8 (2d Cir.1984) ("the fact that there may be a few confused consumers does not create a sufficiently disputed issue of fact regarding the

likelihood of confusion so as to make summary judgment improper."). *But cf. Transamerica Corp. v. Trans America Abstract Serv., Inc.*, 698 F.Supp. 1067, 1075 (E.D.N.Y.1988) (letter to plaintiff characterizing defendant as its subsidiary was instance of actual confusion).

Accordingly, the evidence does not raise a genuine fact question on the issues of actual confusion or, more fundamentally, likelihood of consumer confusion.

#### 6. Good faith

■ Retirement Living made an extensive search of uses of the words NEW CHOICES and their variants. It investigated marks that it thought might be confusingly similar, and consulted with some companies using like marks; then, in reliance on advice of counsel, decided to use its mark. That process shows reasonable and good-faith action in adopting the mark. *See E.S. Originals Inc. v. Stride Rite Corp.*, 656 F.Supp. 484, 490 (S.D.N.Y.1987) (trademark search and reliance on advice of counsel shows good faith); *Cuisinarts, Inc. v. Robot–Coupe Int'l Corp.*, 580 F.Supp. 634, 638 (S.D.N.Y.1984).

Against that showing, Dr. Lang asserts that Retirement Living's representatives have had suspicious memory lapses about the events surrounding its decision that Retirement Living's mark does not infringe Dr. Lang's. At most, this raises suspicion and conjecture.

■ Issues of good faith are generally ill-suited for disposition on summary judgment, *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1559–60 (2d Cir.1989), but here the undisputed evidence shows that Retirement Living acted in good faith in deciding to use its mark. Thus summary judgment is appropriate. *See Pittston Warehouse Corp. v. American Motorists Ins. Co.*, 715 F.Supp. 1221, 1224 (S.D.N.Y.1989) ("Where a question of good faith is involved, summary judgment should be granted where the facts do not demonstrate any evidence of such bad faith."); *see also Lapir v. Maimonides Medical Center*, 750 F.Supp. 1171, 1177 (E.D.N.Y.1990).

#### 7. Quality of plaintiff's product and sophistication of purchasers

There is no dispute that the quality of Retirement Living's product is high, and no evidence concerning the sophistication of the buyers of the parties' products.

\* \* \* \* \* \*

In sum, a reasonable factfinder could not determine that there is a likelihood of confusion in this case. While Dr. Lang asserts that trademark infringement is a question of fact, the undisputed evidence shows that each of the *Polaroid* factors weighs against a finding there is such confusion, some of them heavily. Accordingly, Retirement Living's motion for summary judgment is granted. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986) (party opposing summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts.").

#### C. *State Law Claims*

Dr. Lang asserts claims under state law, for violation of New York's anti-dilution statute, N.Y.Gen.Bus.L. § 368–d (McKinney 1984) and for use of a trade name with intent to deceive the public, *id.* § 133.

■ Retirement Living's motion for summary judgment on those claims is granted. Section 368–d protects only strong marks, and as stated above there is no evidence that New Choices Press has attained a secondary meaning capable of dilution. *See Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 399 N.Y.S.2d 628, 632, 369 N.E.2d 1162, 1166 (1977).

■ Section 133 is procedurally inapposite. It provides for a summary proceeding for an injunction, not a plenary action. *Lincoln Restaurant Corp. v. Wolfies Rest., Inc.*, 291 F.2d 302, 304 (2d Cir.) (construing section 133's predecessor), *cert. denied*, 368 U.S. 889, 82 S.Ct. 143, 7 L.Ed.2d 88 (1961).

**140**

## CONCLUSION

Retirement Living's motion for summary judgment is granted. It is to submit a proposed form of judgment within thirty days from the date hereof, on notice and on consent as to form, if possible.

