**Doe LANG, Petitioner/Defendant-Appellant,**

**v.**

**RETIREMENT LIVING PUBLISHING CO., INC., Respondent/Plaintiff-Appellee.**

**No. 96, Docket 91-7336.**

United States Court of Appeals, Second Circuit.

Argued Aug. 30, 1991.

Decided Nov. 18, 1991.

Richard A. Altman, Brooklyn, N.Y., for petitioner/defendant-appellant.

David Goldberg, New York City, (Richard S. Mandel, Cowan, Liebowitz & Latman, P.C., New York City, Michael Brizel, The Reader's Digest Ass'n, Inc., Pleasantville, N.Y., of counsel), for respondent/plaintiff-appellee.

Before OAKES, Chief Judge, FEINBERG and CARDAMONE, Circuit Judges.

OAKES, Chief Judge:

In this trade name infringement case, under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988), Doe Lang appeals from an opinion and order of, and a judgment entered pursuant thereto in, the United States District Court for the Southern District of New York, Louis L. Stanton, *Judge,* granting defendant Retirement Living Publishing Co. Inc.'s (Retirement Living) motion for summary judgment. Because we agree with the district court that Lang failed to raise a genuine issue of fact on the likelihood of confusion, we affirm.

I

This dispute turns on who holds the right to use the words "New Choices" in a trade name as that term is used in the Lanham Act, 15 U.S.C. § 1127 (1988). In 1985, author and educator Doe Lang formed New Choices Press, which to date has published one book entitled *The Secret of Charisma: What It Is and How To Get It,* and has issued cassettes similarly dealing with the development of charisma. In 1988, Retirement Living (a subsidiary of Reader's Digest Association) purchased *50 Plus,* a magazine designed, not surprisingly, for readers over fifty. As part of an effort to revamp the publication, Retirement Living decided to change the magazine's name and ultimately selected *New Choices For The Best Years.*

Lang runs New Choices Press out of her apartment in New York City. Her apartment is also home to her image consulting firm, Charismedia, of which she is the pres-

ident. Lang has advertised her charisma-building products and services and has also received considerable media attention. Only a few of the advertisements and articles, however, mention New Choices Press. Despite this advertising and publicity, New Choices Press remains a modest-sized business. Through late 1989, New Choices Press's sales have totaled approximately $85,000. One-half of these sales were made through a distributor. The remainder, direct sales, have consistently amounted to less than $2,000 a year. New Choices Press has never published a magazine, nor does it have any plans to do so. Lang has considered publishing several self-help guides but at present these plans have not crystallized. The name "New Choices Press" appears in small block letters, above a sun and pedestal design, on the spine of the charisma book.

The name of Retirement Living's magazine, *New Choices For The Best Years,* figures prominently at the top of the cover, with "New Choices" in larger hollow slanted letters on top, and "For The Best Years" in smaller block letters below. The magazine has over 580,000 subscribers. Like its predecessor, the magazine focuses primarily on the interests of readers between the ages of 45 and 65.

Retirement Living selected the name *New Choices For The Best Years* after considering other similar names and directing its outside trademark counsel to conduct a trademark search. The search did reveal New Choices Press and, in response, the law firm sent an associate to the premises to investigate. The associate determined, of course, that the address was that of an apartment house. The associate also determined that New Choices Press published one book and several tapes, but furnished no product or services entitled "New Choices."

Beginning in late 1988, Lang's office received a number of phone calls from persons trying to reach *New Choices For The Best Years,* whose number was not yet in the telephone directory. The calls ceased from September 1989 to May 1990 after both the Manhattan Yellow and White Pages listed *New Choices For The Best Years* in the summer of 1989. In late May 1990, however, the magazine changed its phone number and once more Lang received misdirected calls. Retirement Living claims that this new series of calls resulted from the phone company's failure to give out the correct number, and the remedying of this error caused the misdirected calls to cease. Lang, on the other hand, maintains that the calls persisted at least up to December 1990.

Meanwhile, the first set of phone calls prompted Lang, in May 1989, to bring suit in state court to enjoin Retirement Living from using the name "New Choices", under New York General Business Law, N.Y. Gen.Bus.Law § 133 (McKinney 1988). Retirement Living removed the suit to federal district court, where Lang's motions for preliminary injunctive relief were denied. No. 89 Civ. 3868 (S.D.N.Y. Nov. 6, 1989), *aff'd,* 898 F.2d 137 (2d Cir.1990) (unpublished summary order). Upon completion of discovery, the district court granted Retirement Living's motion for summary judgment, *Lang v. Retirement Living Publishing Co., Inc.,* 759 F.Supp. 134 (S.D.N.Y.1991), thus giving rise to this appeal.

## II

The central issue in trade name infringement cases such as this one is the same as it is in trademark cases, namely, whether there is a likelihood of confusion.[1] *See Restatement (Third) of Unfair Competition* § 20 (Tent. Draft No. 2, 1990); *see also Accuride Int'l, Inc. v. Accuride Corp.,* 871 F.2d 1531, 1535 (9th Cir.1989). Whether a trademark owner receives judicial protection depends on "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in

1. Although the parties have described "New Choices Press" as a trademark, we believe it is a trade name and will refer to it as such.

question." *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1130 (2d Cir. 1979) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978) (per curiam), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)). Appellant argues that the resolution of this issue on a motion for summary judgment is inappropriate in general, and especially inappropriate given the factual complexity of this case.

Federal Rules of Civil Procedure 56(c) provides, of course, that the court shall grant summary judgment when the pleadings, evidence obtained through discovery, and affidavits show that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. As the Supreme Court explained in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." A dispute as to a material fact is "genuine," and hence summary judgment is not appropriate, under this standard, only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510. In determining how a reasonable jury would decide, the court must resolve all ambiguities and draw all inferences against the moving party. *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989).

Although appellant does not dispute these general standards, she asserts that they require greater justification for a grant of summary judgment in a trademark case, since the existence of a likelihood of confusion may involve a series of inferences. Our cases, however, show that summary judgment may be appropriate in certain trademark actions. For example, in *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 115 (2d Cir.1984), we affirmed the district court's grant of summary judgment against the plaintiff with respect to his trademark infringement claim, explaining that the plaintiff had "failed to raise a question of fact on the issue of the likelihood of consumer confusion." *See also Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 876 (2d Cir.1986) (application of undisputed facts to the issue of likelihood of confusion is a legal issue appropriately decided on a motion for summary judgment); *Murphy v. Provident Mutual Life Ins. Co.*, 923 F.2d 923, 930 (2d Cir.1990), *cert. denied*, — U.S. —, 112 S.Ct. 65, 116 L.Ed.2d 40 (1991) (affirming grant of summary judgment for defendant). Thus, our task in this appeal is to determine whether Lang has raised a genuine issue of fact on the issue of the likelihood of confusion. For this, we turn to the eight-factor test first set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961) as supplemented by the *Restatement, supra*, §§ 20–23. *See generally Papercutter, Inc. v. Fay's Drug Co., Inc.* 900 F.2d 558, 562 (2d Cir.1990) (relying on the *Restatement* for guidance in a Lanham Act case).

The *Polaroid* test looks to the following factors: the strength of the prior owner's mark, the similarity between the two marks, the competitive proximity of the products, the likelihood that the prior user will bridge the gap, actual confusion, the defendant's good faith, the quality of defendant's product, and the sophistication of the buyers. *Polaroid* at 495. In applying this test, the list of factors "does not exhaust the possibilities," *id.* (citing *Restatement of Torts* §§ 729, 730, 731), and "[n]o single *Polaroid* factor is determinative." *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1004 (2d Cir.1983). Instead, each factor must be considered in the context of the others, and balanced to determine whether a likelihood of confusion exists. *Id.* Additionally, we note that in reviewing the district court's determinations, its "findings on each of the *Polaroid* factors are entitled to considerable deference." *Lois Sportswear*, 799 F.2d at 873.

1. Strength of the Mark

Here, the inquiry focuses on "the distinctiveness of the mark, or more precisely, its tendency to identify the goods" as coming from a particular source. *McGregor–Doniger,* 599 F.2d at 1131. The district court found that "the indisputable evidence shows that Dr. Lang's mark is weak." The court explained that 1) there was extensive third party use of the words "Choice" or "Choices" in the titles of publications; 2) the layout of Lang's mark was prosaic; 3) Lang's business was limited; and 4) media coverage and marketing was limited and did not emphasize the name "New Choices Press."

The parties agree, although the court is not so confident, that Lang's trade name is suggestive.[2] Lang argues that as a suggestive name, her name is entitled to protection and is strong without evidence of secondary meaning. Although a suggestive mark is *entitled to registration* without evidence of secondary meaning, *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 11 (2d Cir.1976); *Restatement, supra,* § 13 comment b, suggestiveness is not necessarily dispositive of the issue of the strength of the mark. *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 76 (2d Cir.1988). Ultimately, the strength of the mark turns on its " 'origin-indicating' quality, in the eyes of the purchasing public," so that in a given case whether the mark has acquired "secondary meaning" is a matter which may be relevant and probative and hence useful in determining the likelihood of confusion. *McGregor–Doniger,* 599 F.2d at 1131. Accordingly, we next evaluate the strength of Lang's name by examining the degree to which the words "New Choices" tend to identify Doe Lang's business in the public's eye.

As we have suggested, extensive third party use of the words "Choice" and "Choices" weighs against a finding that Lang's trade name is strong. *Plus Products,* 722 F.2d at 1005; *see also Restatement, supra,* § 13 comment e at 45–46. Similarly, the ordinary layout of the words "New Choices" tends to undermine the claim that it is recognizable to, or distinctive in the minds of, consumers. New Choices Press's total sales of only $85,000 since 1985, spread throughout the nation and in several foreign countries, and largely in reference to the one book on charisma, further negates the inference that New Choices Press is associated in the public's mind with Lang's book and tapes. *See C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.,* 753 F.2d 14, 17–18 (2d Cir.1985). Finally, most of the articles and advertisements referring to Lang's book and tapes do not refer to New Choices Press at all, thus making it doubtful that this publicity has led consumers to associate the book with its publishing source. *See Restatement, supra,* § 13 comment e at 45. These factors, taken together, indicate that the district court determined correctly that Lang's trade name is weak.

Lang also invites this court to adopt the doctrine of secondary meaning in the making. *See Cicena Ltd. v. Columbia Telecommunications Group,* 900 F.2d 1546, 1549–50 (Fed.Cir.1990). We decline to do so. *See Restatement, supra,* § 13 reporter's note at 53.

2. Similarity of the Marks

This factor looks to whether the similarity of the marks is likely to provoke confusion among prospective purchasers. *McGregor–Doniger,* 599 F.2d at 1133. In making this determination, a court should look at the general impression created by the marks, taking into account all factors that potential purchasers will likely perceive and remember. *Id.* at 1133–34. The district court found that despite similarities, there seemed to be little chance that consumers will confuse Lang's publishing company with Retirement Living's magazine.

Both designations include as their focal point the words "New Choices." However, Lang's name always includes the word

2. The words "New Choices" are broadly defined, commonly used words that seem descriptive in nature, as opposed to being inherently distinctive or fanciful.

"Press," whereas Retirement Living's mark always includes the words "For The Best Years." The typeface also serves to distinguish the two designations, as does the location of the designations on the products. *See Restatement, supra,* § 21 comment c at 192. As such, the general impression conveyed to the public by these designations differs significantly, and therefore we agree with the district court that the similarities do not create an issue of fact on the likelihood of consumer confusion.

3. Proximity of the Products

This factor focuses on whether the two products compete with each other. To the extent goods (or trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion. *See Restatement, supra,* § 21 comment j at 197–99. The district court found that the products were not proximate.

Because Retirement Living's magazine caters to the interests of older adults generally, whereas Lang's publishing house markets her book and tapes to all people who seek specifically to enhance their charisma, the products neither compete nor serve the same purpose. Lang's book and tapes are best classified as image-building products; Retirement Living's magazine addresses diverse topics of interest to mature consumers, including travel, finance, health, and nutrition. The two companies' products are not used together. Although both Lang's publishing house and Retirement Living's magazine are in the field of publishing, this does not render them proximate. *See, e.g., Inc. Publishing Corp. v. Manhattan Magazine, Inc.,* 616 F.Supp. 370, 381–85 (S.D.N.Y.1985) (although the magazines "Inc." and "Manhattan, Inc." both are the same size, appear monthly, and deal generally with the business world, the differences reduce the likelihood of consumer confusion), *aff'd,* 788 F.2d 3 (2d Cir. 1986). Because of these differences, we agree with the district court that the products are not proximate, and thus this factor also fails to give rise to a question of fact regarding the likelihood of consumer confusion.

4. Bridging the Gap

This factor turns on the likelihood that Lang will enter Retirement Living's market. The district court correctly found that Lang's expansion plans remained "wholly speculative."

The district court did not draw a favorable inference from Lang's evidence regarding her expansion plans, and it is argued that as the nonmovant, the court should have drawn all inferences in her favor and thus should not have dismissed her plans so summarily. Even if there were such an error, however, there is no genuine issue of fact as to the likelihood of confusion for two reasons. First, even if Lang does effectuate her expansion plans, she will not have "bridged the gap" because the plans do not include the publication of either a magazine or any other publication directed specifically to the interests of older adults. Second, "the intent of the prior user to expand or its activities in preparation to do so, *unless known by prospective purchasers,* does not affect the likelihood of confusion." *Restatement, supra,* § 21 reporter's note at 210 (emphasis added); *see also McGregor–Doniger, Inc.,* 599 F.2d at 1135–36. Lang has provided no evidence that prospective purchasers would assume that New Choices Press would publish a magazine or other publication aimed at older adults.

5. Actual Confusion

The approximately four hundred phone calls and several letters received by Lang from people attempting to reach Retirement Living's magazine obviously reflect some sort of confusion. At issue is whether this is the type of confusion against which the Lanham Act was designed to protect.

The Lanham Act seeks to prevent consumer confusion that enables a seller to pass "off his goods as the goods of another." *Programmed Tax Systems, Inc. v. Raytheon Co.,* 439 F.Supp. 1128, 1132

(S.D.N.Y.1977) (quoting *Jean Patou, Inc. v. Jacqueline Cochran, Inc.*, 201 F.Supp. 861, 863 (S.D.N.Y.1962), *aff'd*, 312 F.2d 125 (2d Cir.1963). In *Programmed Tax Systems*, the court explained that the relevant confusion is that which affects "the purchasing and selling of the goods or services in question." *Id.* The *Restatement* concurs, citing to Judge Lasker's opinion in *Beneficial Corp. v. Beneficial Capital Corp.*, 529 F.Supp. 445, 450 (S.D.N.Y.1982), for the proposition that "trademark infringement protects only against mistaken purchasing decisions and not against confusion generally." *Restatement, supra,* § 20 reporter's note at 179.

It is not clear what prompted the error on the part of each caller. The evidence shows that the calls ceased following the listing of *New Choices For The Best Years* in local phone books, likely indicating that the confusion resulted from the absence of any listing for *New Choices For The Best Years.* The evidence also shows, however, that several callers did have some question about whether the two entities were affiliated. At any rate, no evidence links the confusion evinced by the calls to any potential or actual effect on consumers' purchasing decisions.

Moreover, a closer look at Lang's claim shows that her reliance on the phone calls as evidence of actual confusion is misplaced. Appellant emphasizes that because this case involves reverse confusion, the commercial injury she has suffered is an erosion of goodwill and a loss of control over her reputation, and as such is a more subtle injury than the customary diversion of trade engendered by direct confusion. Reverse confusion exists when a subsequent user selects a trademark that is likely to cause consumers to believe, erroneously, that the goods marketed by the prior user are produced by the subsequent user. *Restatement* § 20(1)(c) & comment f at 174; *see also Banff, Ltd. v. Federated Dept. Stores, Inc.*, 841 F.2d 486, 490 (2d Cir.1988) ("Reverse confusion is the misimpression that the junior user is the source of the senior user's goods."). The misdirected phone calls are not relevant because, even if we infer in Lang's favor that they reflect consumer confusion, those consumers erroneously believed that the *senior user* (Lang) was the source of the *junior user's* (Retirement Living) magazine. Evidence of actual reverse confusion that might support Lang's claim would involve purchasers or prospective purchasers of Lang's products who believed that they were produced by or affiliated with Retirement Living's magazine. Appellant, however, has failed to proffer any such evidence. Similarly, Lang has not shown that these misdirected callers were prospective purchasers of Lang's products. In sum, there is no reason to believe that confusion represented by the phone calls could inflict commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation. Accordingly, this evidence failed to demonstrate a genuine issue as to any material actual confusion.

6. Good Faith

This factor "looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Edison Brothers Stores, Inc. v. Cosmair, Inc.*, 651 F.Supp. 1547, 1560 (S.D.N.Y.1987). Although the district court correctly acknowledged that "[i]ssues of good faith are generally ill-suited for disposition on summary judgment" (citing *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1559–60 (2d Cir. 1989)), we agree with its determination that Retirement Living acted in good faith.

Selection of a mark that reflects the product's characteristics, request for a trademark search and reliance on the advice of counsel are factors that support a finding of good faith. *E.S. Originals Inc. v. Stride Rite Corp.*, 656 F.Supp. 484, 490 (S.D.N.Y.1987). Here, the name *New Choices For The Best Years* reflects the image that its new owners sought to convey, and Retirement Living requested a trademark search and relied on the advice of its counsel in choosing the name. Further, Retirement Living's prior knowledge of Lang's trade name does not give rise to

a necessary inference of bad faith, because adoption of a trademark with actual knowledge of another's prior registration of a very similar mark may be consistent with good faith. *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 48 (2d Cir.1978) (per curiam), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

At bottom, Lang relies, as evidence of bad faith, on Retirement Living's attorneys' inability to recall conversations leading up to Retirement Living's selection of the magazine's name. However, in light of the facts leading up to Retirement Living's choice of the mark and the improbability that Retirement Living would choose this mark in the hope of capitalizing on New Choices Press' reputation, the attorneys' forgetfulness fails to raise a genuine issue of fact.

In sum, our consideration of the relevant *Polaroid* factors [3] compels the legal conclusion that Lang failed to raise a genuine issue of material fact on the existence of a likelihood that Retirement Living's use of its mark will confuse reasonably prudent purchasers. Accordingly, the district court properly granted summary judgment for Retirement Living on Lang's Lanham Act claim.

## III

Our review of Lang's remaining claims indicate that they also lack merit. First, because the district court properly held that, as a matter of law, there was no likelihood of confusion, Lang's damage claim must fail. Turning next to Lang's New York anti-dilution claims, to prevail under N.Y.Gen.Bus.L. § 368–d (McKinney 1988), Lang must show that her trade name has a truly "*distinctive* quality" or has "acquired a secondary meaning in the mind of the public." *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 547, 399 N.Y.S.2d 628, 633, 369 N.E.2d 1162, 1166 (1977). Here, the district court correctly determined that Lang offered insufficient evidence to permit a jury to find that her name was either distinctive or had secondary meaning.

## IV

Accordingly, the judgment of the district court is affirmed.