**In re Stewart T. SCHANTZ, Debtor.**

**Stewart T. SCHANTZ and Priscilla V. Schantz, Plaintiffs,**

**v.**

**MARINE MIDLAND BANK, N.A., Defendant.**

**Nos. 94–10375, 94–CV–1008 LEK/RWS. Adversary No. 94–91046.**

United States District Court, N.D. New York.

Jan. 5, 1998.

Hodgson, Russ Law Firm (Richard L. Weisz, of counsel), Albany, NY, for Plaintiffs.

Phillips, Lytle Law Firm (William J. Brown, of counsel), Buffalo, NY, for Defendant.

### MEMORANDUM–DECISION AND ORDER

KAHN, District Judge.

Presently before the Court are several motions. Plaintiffs have moved for summary judgment on their claims, and defendant has made a cross-motion for summary judgment. Additionally, plaintiffs have moved pursuant to Rule 55(c) of the Federal Rules of Civil Procedure to set aside the Clerk's entry of default on defendant's counterclaims, and defendant has cross-moved for an order granting default judgment. For the reasons discussed below, plaintiffs' motions are denied and defendant's cross-motions are granted.

### I. Background

Stewart T. Schantz ("Schantz"), an attorney admitted to practice in New York, set up Stewart T. Schantz, P.C. ("Schantz, P.C.") in the early seventies as a professional corporation of which he was sole director, sole officer and sole shareholder. He conducted his law practice through Schantz, P.C. from its formation until approximately February 4, 1994, at which time he filed for voluntary relief under Chapter 11 of the Bankruptcy Code.

This action concerns the assets of a pension plan created by Schantz which were

pledged as collateral for loans supplied by defendant Marine Midland Bank ("Marine"). Although the complete history of the plan is complex, the relevant facts can be summarized as follows.

In 1973, Schantz, P.C. created a Target Benefit Pension Plan and Trust Agreement ("Target Plan") as a retirement pension plan for Schantz, P.C.'s employees.[1] A separate Profit Sharing Plan was set up, using the Target Plan as a funding vehicle. Around November 30, 1976, Schantz, P.C. executed a Trust Agreement ("1976 Trust Agreement") which amended and restated the trust provisions of the Target Plan in a separate document. *See* Weisz Aff. Exh. A at 1. The trustee was designated to be Manufacturer's and Trader's Trust Corp. ("M & T Bank"), a subsidiary of a banking corporation on which Schantz served as a member of the board of directors. However, on May 11, 1983, Schantz discharged M & T Bank and appointed himself trustee.

The Target and Profit Sharing Plans were subsequently amended on numerous occasions. However, only two such amendments affected the trust provisions relevant to this action. In 1985, Schantz, P.C. adopted revisions of both the Target Plan and the Profit Sharing Plan, signed on March 28, 1985 but back dated to be effective as of January 1, 1984 ("1985 Target Plan" and "1985 Profit Sharing Plan", respectively). McNamara Aff. Exh. 18, 19. The terms of the 1985 Target Plan replaced the trust provisions of the 1976 Trust Agreement. In 1992, the Target Plan was eliminated and its terms merged into the Profit Sharing Plan. The amended 1992 Profit Sharing Plan ("1992 Profit Sharing Plan") included provisions defining terms of the trust that were substantially the same as those terms included in the 1985 Target Plan. The various Target and Profit Sharing Plans, including the final merged 1992 Profit Sharing Plan, will hereinafter all be referred to as "the Plan."

Schantz first opened an account with Marine in the name of the Plan in February of 1984, consisting of certificates of deposit, and subsequently made additional deposits into the account. However, acting as trustee of the Plan, Schantz also began taken out loans from Marine, pledging the assets of the Target Plan account as security. As the certificates of deposit matured and were rolled over, these security agreements were renewed. Ultimately, Schantz executed no fewer than twenty pledge agreements. Def. Uncon. Facts. ¶ 10. He then used the loans from Marine, in part, to repay loans he'd taken out from the Target Plan itself and to satisfy the Target Plan's mandatory contribution requirements. *Id.* at ¶ 11. Prior to receiving these loans, Schantz had provided Marine with a copy of the 1976 Trust Agreement. However, Marine did not receive copies of either the 1985 Target Plan amendment or the 1992 Profit Sharing Plan.

Between July 22, 1991, and October 22, 1992, Marine made two loans to Schantz totalling $638,000.000 and four loans to Schantz, P.C. totalling $550,000.00. These were made in renewal of earlier loans, and Schantz pledged the Target Plan account as collateral in fashion similar to the previous pledges. In addition, Schantz submitted an opinion letter from Schantz to Marine dated March 29, 1990, which provided that Schantz, as trustee, had the authority to pledge the Plan assets.

Both Schantz and Schantz, P.C. defaulted on their obligations, and later defaulted on the terms of a forbearance agreement entered into on June 30, 1993 and a second forbearance agreement entered into by letters dated October 22, 1993 and November 4, 1993. McNamara Aff. ¶ 7. Around December 14, 1993, Marine, exercising its rights under the pledge agreements, applied the proceeds of the Plan accounts to set off Schantz's indebtedness. After this application, Schantz's debt, previously $619,914.86, was reduced to $67,180.52. All of Schantz, P.C.'s debt remains unpaid. Schantz filed for Chapter 11 relief on February 4, 1994.

## II. Procedural History

Schantz began this adversary proceeding on March 4, 1994 in bankruptcy court, seek-

---

**1.** From a subsequent disclosure of beneficiaries to Marine, it is apparent that Schantz was the primary beneficiary of the plan, ultimately entitled to $604,405.68 out of the $629,982.24 held by the trust in early 1993. Def. Uncont. Facts. ¶ 14.

ing an order directing Marine to turn over the proceeds that it had applied to Schantz's debt. Schantz's principal argument was that he had been without authority to pledge the accounts as collateral under the terms of the Trust, New York law and the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), and that the pledge agreement was therefore unenforceable.

Marine answered, and moved for an order pursuant to 28 U.S.C. § 157(d) and Rule 5011(a) of the Federal Rules of Bankruptcy Procedure withdrawing the reference of the proceeding on the grounds that resolution of plaintiffs' claims required substantial and material consideration of ERISA. This motion was granted by Judge Cholakis on July 19, 1994. Schantz then served an Amended Complaint on August 1, 1994, which added his wife, Priscilla V. Schantz ("Mrs. Schantz") as a party plaintiff and added a cause of action alleging that the pledge of assets was invalid with respect to that part of the account to which Mrs. Schantz had an interest under ERISA as a survivor beneficiary.

Marine delayed in filing an answer for several months, pursuant to an agreement between the parties, entered into at the suggestion of plaintiffs' attorney, Richard Weisz ("Weisz"), that the proceedings not be continued until the completion of Schantz's plan of reorganization. Marine was notified by Weisz that confirmation of a proposed plan would take place on January 9, 1996. Marine then filed an answer with counterclaims on January 22, 1996. Marine's counterclaims included claims for fraud, negligent misrepresentation, indemnification and fraudulent conveyance. In addition, Marine requested a declaratory judgment that plaintiffs' trust was not an ERISA-qualified trust.

The plaintiffs failed to respond. On January 9, 1997, over eleven months after the filing of the answer, the clerk made an entry of default on Marine's counterclaims. Plaintiffs have moved this Court to set aside the entry of default, and Marine has cross-moved for a default judgment.

### III. Discussion

#### A. Summary Judgment Motions

The Court will address first the motions by both parties for summary judgment on plain-tiffs' claims. Summary judgment must be granted when the pleadings, affidavits and other papers show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 580 (2d Cir.1991).

It is not disputed that Schantz executed agreements pledging the accounts as collateral, or that Schantz defaulted on his loan. The issue, therefore, is whether the pledge agreements were valid and enforceable. Plaintiffs argue that Schantz had no authority to pledge the assets of the Plan, and that they are therefore entitled to a return of all of the funds, and that in any case, the pledge is invalid with respect to Mrs. Schantz's interest, alleged to be one-half of the amount applied to Schantz's debt.

#### 1. Validity of the pledge under New York law

Plaintiffs argue that the pledge was invalid because the Plan is a "spendthrift" trust under New York law and that the Plan's funds were therefore inalienable. However, the term "spendthrift trust" simply reflects an acceptance by the courts of the enforceability of certain kinds of anti-alienation provisions. *See* Restatement (2d) of Trusts § 152(2)(1959) ("A trust in which, *by the terms of the trust or by statute* a valid restraint on the voluntary or involuntary transfer of the interest of the beneficiary is imposed, is a spendthrift trust."). The two cases cited by plaintiff are not to the contrary. *See In re Vought's*, 25 N.Y.2d 163, 171, 303 N.Y.S.2d 61, 250 N.E.2d 343 (1969) ("The question, then, is whether judicial recognition may be given to an attempt to restrain alienation during the term of the trust."); *Knight v. Knight*, 182 A.D.2d 342, 589 N.Y.S.2d 195, 196 (N.Y.App.Div.1992), *leave to appeal den.*, 81 N.Y.2d 704, 595 N.Y.S.2d 399, 611 N.E.2d 299 (1993) (under California law, attempted assignment of interest in remainder of trust violated anti-

alienation provision). *See also* Restatement (Third) of Trusts § 191 (1992) ("Unless prohibited by statute or the terms of the trust, the trustee has power to borrow money and to mortgage, pledge, or otherwise encumber trust property for trust purposes.") Thus, the Court must consider whether the pledge is prohibited under New York statutes or by an express provision in the trust document.

■ In New York, the statute which restricts alienation of trust interests is N.Y. Est. Powers & Trusts Law ("EPTL") § 7–1.5 (McKinney 1997). This provision states that

[t]he interests of the beneficiary of any trust may be assigned or otherwise transferred, except that (1) [t]he right of a beneficiary of an express trust to receive the income from property ... may not be transferred by assignment or otherwise unless a power to transfer such right ... is conferred upon such beneficiary by the instrument creating or declaring the trust.

The provision thus restricts only the alienation of the beneficiary's right to receive income from the trust. It does not restrict the alienation of the principal, either by the beneficiary or by the trustee. *See In re Herzig*, 167 B.R. 707, 709 (Bankr.D.Mass. 1994). There is therefore no statutory prohibition of a trustee's pledge of the trust assets. If such a limitation on the trustee's powers exists, it must be found in the language of the documents which creates the trust. *See Matter of Estate of Sackler*, 149 Misc.2d 734, 564 N.Y.S.2d 977, 980 (N.Y.Sur. Ct.1990) (the trust instrument defines the trustee's powers); *Donnelly v. Bank of New York*, 801 F.Supp. 1247, 1256–57 (S.D.N.Y. 1992), *aff'd*, 2 F.3d 403 (2d Cir.1993) (ERISA adopts the New York common law rule that the extent of a trustee's duties and powers is determined from the trust instrument itself and the rules of law that are applicable).

According to the undisputed facts, Marine made loans to Schantz during the period extending from February, 1984, when Schantz first opened an account at Marine, through the end of 1992. Def. Statement ¶ 9. All these loans were secured with the assets of the retirement trust. *Id.* at ¶ 10.

As noted previously, Marine was provided with the terms of the 1976 Trust Agreement, but not with subsequent agreements. However, lack of notice is not relevant to the determination of whether the trustee had actual authority to pledge assets. Therefore, the Court will consider the terms of the trustee's powers under the various documents applicable from the period when the Plan account was opened in 1984 until the time at which the final loan renewals were made in 1991.

■ Relevant trust documents therefore include the 1976 Trust Agreement, the 1985 Target Plan and the 1992 Profit Sharing Plan. Each of these documents includes an anti-alienation provision. In the 1976 Trust Agreement, § 5.1 states that "[n]o right or claim in or to the Fund or any assets thereof shall be assignable or subject to garnishment, attachment, execution, or levy of any kind except as provided in the Plan." Weisz Aff. Ex. A. The two later documents include provisions somewhat different from the first. These provisions state in part that "[n]o benefit of the plan shall be subject, either voluntarily or involuntarily, in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and any act in violation of the foregoing shall be null and void." *See* McNamara Aff. Ex. 18, 29.

The later two provisions do not restrict the power to pledge assets in any way. They limit only the power to alienate the beneficiary's right to receive benefits. This is clear from the language prohibiting alienation of a "benefit of the plan."

The provision in the 1976 Trust Agreement, prohibiting alienation of any right in "assets" could be interpreted to affect a trustee's right to pledge the actual assets of the trust. However, that same document, as well as the two later documents, also includes a provision expressly giving the Trustee the power "[t]o borrow or raise money for the purposes of the Trust in such amount, and upon such terms and conditions, as the Trustee shall deem advisable ... and to secure the repayment thereof by pledging all, or any part, to the Trust Fund." *See* McNamara Aff. Ex. 16 (1976 Trust Agreement

§ 2.2(f)), Ex. 18 (1985 Target Plan § 9.3(f)), Ex. 29 (1992 Profit Sharing Plan § 7.3(e)).

Therefore, to interpret any of the anti-alienation provisions as prohibiting the Trustee from pledging assets would nullify the provisions which expressly give the Trustee that very power. It is a well-established rule of both contract and trust interpretation that a court shall not read the document in such a way as to render a term meaningless or inoperative. *See deBrossard v. Van Norden,* 113 A.D.2d 123, 495 N.Y.S.2d 369, 372 (N.Y.1985) ("The rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract, or in the negative, no provision of a contract should be left without force and effect." (citation and internal quotations omitted)); *Haas v. Speenburgh,* 122 Misc. 458, 203 N.Y.S. 202, 204 (N.Y.Sup.Ct. 1924), *aff'd,* 212 A.D. 844, 207 N.Y.S. 847 (N.Y.1925) ("every provision in a will must be given some effect, rather than rendered meaningless and inoperative"); *In re Hickey's Estate,* 73 N.Y.S.2d 508, 516 (N.Y.Sur. Ct.1939) (words in document creating trust should never be rejected as meaningless if by any reasonable construction they can be made consistent). *See also In re Vought's,* 25 N.Y.2d at 167, 303 N.Y.S.2d 61, 250 N.E.2d 343 (rejecting interpretation of trust document that would render anti-alienation clause "meaningless").

The Court therefore concludes that the anti-alienation clauses in the various documents implementing the Plan should be interpreted to prohibit only the alienation of a beneficiary's legal right to receive benefits. While the beneficiary cannot pledge such funds as he or she is entitled to receive, the trustee may still, pursuant to his express powers, pledge the actual assets of the plan. This interpretation is in accord with the meaning generally given similar anti-alienation provisions by the New York courts. *See, e.g., In re Vought* at 167, 172, 303 N.Y.S.2d 61, 250 N.E.2d 343 (clause holding that "the principal shall not be assignable" interpreted as attempting to "post-pone for a

limited period the *beneficiary's control* of material wealth until a time when the beneficiary is believed to be more able to manage it" (emphasis added)).

Of course, such a pledge may still constitute a breach of the trustee's fiduciary duties to the beneficiaries. However, such a breach by the trustee would not render the pledge void *ab initio;* instead, beneficiaries must seek restitution of any loss from the trustee in an action for breach of fiduciary duty. *See* Restatement (Second) of Trusts § 205 (1959) (three remedies are available if trustee commits breach of trust, all involving action brought against trustee).

An action might be brought against the bank for restitution only where the bank itself is guilty of knowingly participating in the breach of fiduciary duty. *See Estate of Rothko,* 84 Misc.2d 830, 379 N.Y.S.2d 923, 969 (N.Y.Sur.Ct.1975), *decree modif., Will of Rothko,* 56 A.D.2d 499, 392 N.Y.S.2d 870 (N.Y.App.Div.), *aff'd, Matter of Rothko's Estate,* 43 N.Y.2d 305, 401 N.Y.S.2d 449, 372 N.E.2d 291 (1977). However, a bank will not be found to have knowingly participated in a breach of trust where the trustee was acting pursuant to authority expressly granted in the trust. *See Roth v. Manufacturers Hanover Trust,* 178 A.D.2d 267, 577 N.Y.S.2d 381, 382 (N.Y.App.Div.1991). *Roth* applies with particular strength in this case, as the authority to pledge granted in the Plan documents is accompanied in each case by language granting the express assurance that "[n]o person lending money to the Trustee shall be bound to see to the application of the money lent or to inquire into the validity, expediency or propriety of any such borrowing." McNamara Aff. Ex. 16, 18, 29. Since Marine has no direct liability, and Schantz's own breach of duty does not render the pledge void, there is no basis for finding the application of the collateral to Schantz's debts invalid under New York law.[2]

### 2. *Validity of the pledge under ERISA*

Plaintiffs next argue that the pledge is void pursuant to the Employee Retirement

---

2. It is therefore unnecessary to decide whether the "knowing participation" rule, based on equitable principles, can ever be relied upon by a beneficiary who is also the trustee primarily responsible for the breach of trust.

Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"). In particular, plaintiffs rely on § 206(d)(1), 29 U.S.C. § 1056(d)(1), which states that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." This provision is interpreted as imposing an affirmative prohibition on the alienation of benefits provided for by ERISA pension benefit plans. *See Mackey v. Lanier Collection Agency & Serv.*, 486 U.S. 825, 836, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988). Plaintiffs argue that it renders void any attempt to alienate the assets of a plan. Marine argues that the provision does not bar alienation of assets by a trustee, and that in any case, plaintiffs' plan is not ERISA-qualified and therefore not subject to this provision. The Court finds that § 206(d)(1) does not impose a restriction on the right of a trustee to pledge assets, and therefore does not address the issue of whether the Plan is ERISA-qualified.

On its face, § 206(d)(1) only establishes a restriction on the alienation of "benefits provided under the plan." 29 U.S.C. § 1056(d)(1). The plain language does not suggest any restriction on the use of the assets by a trustee that does not alter a beneficiary's rights to such benefits. Further, an "assignment or alienation" has been defined by regulation to include

(i) [a]ny arrangement providing for the payment to the employer of plan benefits which otherwise would be due the participant under the plan, and (ii) [a]ny direct or indirect arrangement ... whereby a party acquires from a participant or beneficiary a right or interest enforceable against the plan in, or to, all or any part of a plan benefit payment which is, or may become payable to the participant or beneficiary.

26 C.F.R. § 1.401(a)–13(c) (1991). *See also Boggs v. Boggs*, 520 U.S. 833, ——, 117 S.Ct. 1754, 1765, 138 L.Ed.2d 45, *reh. denied,* —— U.S. ——, 118 S.Ct. 9, 138 L.Ed.2d 1043 (1997). Both parts of the definition are restricted to the alienation of the legal right of the beneficiary to receive benefits, a right which is independent of the trustee's ownership of those benefits. The pledging of a trust asset would not alter a beneficiary's legal right to receive benefits, although it might make the actual collection of those benefits more difficult.

The court in *O'Toole v. Arlington Trust Co.*, 681 F.2d 94 (1st Cir.1982) relied upon this distinction in finding that a bank, which had used the deposited assets of a trust to offset the trustees' outstanding loans, was not subject to ERISA's anti-alienation provision:

It is a short step from saying that an individual beneficiary should not be allowed to alienate or assign his benefits to saying that one of his creditors similarly should not have the right to attach those benefits. To say, however, that under [§ 1056(d)(1) ] the depository of the entire fund is prohibited from levying on the fund for security purposes requires not a step, but a leap to a different plane. The focus must be changed from the protection of the benefits of each person, viewed separately, to the protection of all those benefits, viewed in the aggregate. While such a change in focus might result in laudable protection, it is not supported by the wording of § 1056(d), the statutory prohibition. The prohibition is directed at "benefits provided," not the corpus of the fund; and the potential for assignment or alienation, which is limited by the prohibition, would seem to lie with the beneficiary, not the depository. [ ] We would be hard-pressed [therefore] to find that § 1056(d) was intended to do more than address the individual beneficiary's right of access to his share of the fund.

*Id.* at 96 (concluding that § 1056(d) was not basis for federal jurisdiction in action against bank).

This interpretation is fully consistent with applications of the provision in Supreme Court precedent. For example, in *Guidry v. Sheet Metal Workers Nat. Pension Fund*, 493 U.S. 365, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990), the Supreme Court invalidated an attempt to alienate a trustee's right to receive benefits from the plan. *Id.* at 373, 110 S.Ct. 680. In *Mackey*, the Supreme Court found that § 1056(d)(1) prohibits alienation by creditors of beneficiaries, not creditors of the plan. *Id.*, 486 U.S. at 836, 108 S.Ct. 2182.

In sum, the Court finds that the anti-alienation provision of ERISA does not prohibit a trustee from pledging the assets of the trust as collateral for a loan.

### 3. Mrs. Schantz's Interest

Finally, plaintiffs argue that under Retirement Equity Act of 1984 ("REA"), codified at 29 U.S.C. § 1055, such portions of the assets as would be receivable as benefits by Mrs. Schantz cannot be applied to satisfy a loan without her written consent.

Section 1055 provides certain rights and protections to the spouses of employees covered by pension plans regulated by ERISA. Section 1055(a) provides that the accrued benefits payable to a participant of a pension plan shall be provided "in the form of a qualified joint and survivor annuity...." 29 U.S.C. § 1055(a)(1). A participating spouse is not permitted to waive the qualified joint and survivor annuity ("JSA") option unless the nonparticipant spouse consents in writing to waive JSA benefits. 28 U.S.C. § 1055(c)(2). See Kahn v. Kahn, 801 F.Supp. 1237, 1241 (S.D.N.Y.1992), aff'd, 2 F.3d 403 (2d Cir.1993). Section 1055(c)(4) provides the further protection that

> [e]ach plan shall provide that, if this section applies to a participant when part or all of the participant's accrued benefit is to be used as security for a loan, no portion of the participant's accrued benefit may be used as security for such loan unless ... the spouse of the participant (if any) consents in writing....

29 U.S.C. § 1055(c)(4).

As with the anti-alienation provision, the consent requirement here applies only to the pledge of benefit rights as security, not to the pledge of pension assets. Kahn, supra, and United Parcel Service v. Riley, 141 Misc.2d 78, 532 N.Y.S.2d 473 (N.Y.Sup.Ct. 1988), clarif. denied, 142 Misc.2d 424, 538 N.Y.S.2d 1022 (N.Y.Sup.Ct.1989), cited by plaintiffs, are not to the contrary. In that case, the participant attempted to change the JSA beneficiary from his wife to his sister, without obtaining the consent of the former. Id. at 474. The court found the change of the wife's right to benefits invalid under the REA. Id. Kahn involved a dispute over "whether a participant's former spouse has a right under REA to JSA benefits." Id., 801 F.Supp. at 1241 (emphasis added). Because the REA does not restrict the trustee's powers to pledge assets, it is simply inapplicable to this case.

Plaintiffs' legal arguments against Marine's exercise of its set-off rights are therefore insufficient, and Marine must be granted summary judgment on all of plaintiffs' claims.

### B. Plaintiffs' Default on Marine's Counter-claims

■ The parties have also brought motions with regard to the entry of default against the plaintiffs on Marine's counter-claims. Plaintiffs request that the entry of default be overturned, while Marine moves the Court to issue a default judgment on the counter-claims.

■ A defaulting party may move pursuant to Fed.R.Civ.P. 55(c) to set aside the entry of default for "good cause." This term is not statutorily defined, but the Second Circuit has established three criteria relevant to deciding whether "good cause" is present in a particular case. These factors are (1) whether the default was willful; (2) whether setting aside the default would prejudice the adversary; and (3) whether a meritorious defense is presented. See Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 96 (2d Cir.1993).

### 1. Willfulness

■ A default is considered to be willful where a party knew about the complaint and deliberately failed to respond. Artmatic USA Cosmetics v. Maybelline Co., 906 F.Supp. 850, 855 (E.D.N.Y.1995). In addition, courts have generally held a default to be willful when a lawyer neglects a case for an extended period of time. Id.

■ Here, Weisz neglected to respond to the counter-claims for eleven months. Weisz has not provided any explanation for this delay except oversight. Aff. In Support of Motion To Reopen Clerk's Entry of Default (Aff.Reopen) ¶ 18. Although eleven months of neglect arguably demonstrates a deliber-

ate failure to respond, a court considering whether oversight establishes willfulness must also consider the attorney's efforts to litigate on the merits subsequent to the entry of default. *See Holford USA Ltd., Inc. v. Harvey,* 169 F.R.D. 41, 44 (S.D.N.Y.1996). Weisz responded to the entry of default within three weeks with a memorandum and an affidavit to which a proposed answer was attached, and provided a further memorandum in reply to Marine's motion for default judgment. These responses are sufficient to create a doubt as to the willfulness of the default. In and of itself, this factor provides some small support for the vacating of the default. *See Enron,* 10 F.3d at 96 (doubt should be resolved in favor of the defaulting party).

■ Nevertheless, vacatur must be denied and a default judgment granted because the plaintiffs have failed to demonstrate any meritorious defense to Marine's counter-claims. A party "seeking to vacate an entry of default must present some evidence beyond conclusory denials to support his defense." *Id.* at 98. Here, plaintiffs' only asserted defenses are the arguments with regard to ERISA that the Court has already rejected. Absent any showing of a meritorious defense, the Court must deny plaintiffs' motion to vacate the entry of default and grant Marine's motion for default judgment.

The Court notes that, in its counterclaims, Marine has requested damages equal to the amount of money it must return to the Trust, or else an equitable remedy setting aside the transfer. Since no money must be returned by Marine, these remedies are inapplicable. Further, declaratory judgment is only appropriate to guide parties concerning their rights in an *existing* dispute. *See National Casualty Insurance Co. v. Incorporated Village of Irvington,* 1997 WL 411928, 92 CIV. 2015 (S.D.N.Y. July 22, 1997) citing *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941) ("the question in each case is whether ... there is a substantial controversy ... of sufficient immediacy ... to warrant the issuance of a declaratory judgment.") Here, the controversy with regard to plaintiffs' rights

to the Plan under ERISA is settled, and declaratory judgment on that subject is therefore inappropriate.

However, in its counterclaims, Marine also requested an award of attorney's fees. Judgment should therefore be entered granting Marine reasonable attorney's fees, the precise amount to be determined by the Court upon a subsequent application by Marine setting forth, through a detailed affidavit, the time expended by counsel in litigating this action.

Accordingly, it is

ORDERED that plaintiffs' motion for summary judgment on plaintiffs' claims is DENIED; and it is further

ORDERED that defendant's cross-motion for summary judgment on plaintiffs' claims is GRANTED; and it is further

ORDERED that plaintiffs' motion to reopen the clerk's entry of default is DENIED; and it is further

ORDERED that defendant's motion for default judgment is granted; and defendant is awarded attorney's fees; and it is further

ORDERED that the Clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.