**GOSMILE, INC., a Delaware Corporation, Plaintiff,**

v.

**DR. JONATHAN LEVINE, D.M.D. P.C., a New York Corporation, and Dr. Jonathan B. Levine, an individual, Defendants.**

No. 10 CIV. 8663(PKC).

United States District Court, S.D. New York.

March 7, 2011.

Mark Carl Zauderer, Anne Becker Nicholson, Jonathan Daniel Lupkin, Kimberly Ailisa Pallen, Flemming Zulack Williamson Zauderer, LLP, New York, NY, Annaliese Flynn Fleming, Matthew F. Singer, Wendi Elizabeth Sloane, Barack Ferrazzano Kirschbaum & Nagelberg LLP, Chicago, IL, for Plaintiff.

David Warren Denenberg, Joshua S. Krakowsky, Michael A. Adler, Davidoff, Malito & Hutcher, LLP, Kyle C. Bisceglie, Howard J. Smith, III, Joshua S. Androphy, Olshan, Grundman, Frome, Rosenzweig & Wolosky, LLP, Bruce Jeffrey Ressler, Ellen R. Werther, Ressler & Ressler, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

P. KEVIN CASTEL, District Judge.

Plaintiff Go SMiLE, Inc. ("Go SMiLE") markets and sells tooth-whitening products. Dr. Jonathan B. Levine co-founded Go SMiLE in 2002, and, after he sold a majority interest to investors, remained affiliated with the company as an officer, director and spokesperson. His relationship with Go SMiLE ended in April 2008, after which he began to develop a new tooth-whitening product line that is being marketed under the mark "Glo." Go SMiLE alleges that Levine's "Glo" product line violates Go SMiLE's trademarks under the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), and New York state law.

Go SMiLE has filed a motion for a preliminary injunction, seeking to enjoin Levine personally and his dental practice, defendant Dr. Jonathan Levine, D.M.D.P.C. (the "Practice") from violating Go SMiLE's statutory and common law trademarks. (Docket # 28.) On January 20, February 16 and 17, 2011, the Court presided over an evidentiary hearing on the motion. For the reasons explained below, I find that Go SMiLE has failed to establish a likelihood of success in proving that a consumer would confuse the marks of Go SMiLE with those used by the defendants, and the motion for a preliminary injunction is denied.

## BACKGROUND

Plaintiff Go SMiLE develops and markets teeth-whitening and oral-care products that are used in the home, and sells them directly to consumers via "high-end retail stores," "high-end hotels," a cable shopping channel, and other retailers. (Faust Dec. ¶ 2.) Defendant Jonathan Levine is a dentist who co-founded Go SMiLE in 2002. (Levine Dec. ¶ 3; Stip. ¶ 2.) In 2003, Levine sold his majority interest in Go SMiLE, but remained involved in its management and product development, and acted as its primary marketing spokesman. (Faust Dec. Ex. ¶ 3 & Ex. 1; Levine Dec. ¶¶ 4–5.) Levine's promotional work for Go SMiLE included personal appearances in print and on television, and for a time, his name and likeness appeared on Go SMiLE's product packaging. (Jan. 20 Tr. at 18.) His employment with Go SMiLE was terminated in July 2007, and he resigned from its board of directors in April 2008. (Stip. ¶ 3.) The Practice is a professional corporation with a place of business in New York, and is Levine's dental practice. (Compl. ¶ 8.)

The parties agree that Go SMiLE has registered numerous marks with the United States Patent and Trademark Office ("USPTO"), some of which have been

abandoned.[1] (Stip. ¶¶ 7–8.) Go SMiLE's registered trademarks include "Go Smile," to be used for a tooth whitening system involving peroxide gels; a "Go Smile" dental floss; a "GO SMiLE" mark for breath fresheners, lip balms, mouthwash, teeth whitener and toothpastes; separate trademarks for the phrases "Go Within," "GO-HEALTHY," "Go Travel," "GOSMILE," "GOSMILE AM," "GOSMILE AM/PM," "GOSMILE PM," "TOOTH WHITENING ON THE GO," "SMILECEUTICALS," "SMILE ON THE GO," "ON THE GO," "GOMAINTAIN," "GOPROTECT," "GO DISCOVER," "GO ALL OUT," "GO ON ... SMILE!" and "GO DAILY" as applied to certain oral products; and a mark that consists of the word "GO" in a smiley face logo. (Sloane Dec. Ex. 3.) In certain whitening kits, Go SMiLE employs a logo reading "GOSMiLE SMILE WHITENING SYSTEM," with the "GO" depicted in letters comprised of white, tile-like squares. (*See, e.g.,* Sloane Dec. Ex. 4.) The word "GO" is similarly depicted using white, tile-like squares on other packaging. (Sloane Dec. Exs. 5, 6.) Certain of these marks were filed with the USPTO during Levine's affiliation with Go SMiLE. (Stip. ¶ 8.)

In 2010, the Practice registered the word "Glo" with the USPTO. (Stip. ¶ 10.) Its USPTO applications are pending for other marks, including G.L.O., GUIDED LIGHT OPTICS, G–VIAL, GLO SCIENCE and SMILE REVOLUTION. (Stip. ¶¶ 10.) Levine states that he founded GLO Science, LLC in 2009 "to develop and eventually sell teeth whitening products." (Levine Dec. ¶ 10.) He states that he chose the name GLO science "because 'GLO' is an acronym for 'Guided Light Optics,' " which he describes as "the teeth whitening technology I developed for use in GLO Science's products." (Levine Dec. ¶ 11.) Levine's product employs a mouthpiece to guide light to the teeth, and he states that "GLO" further evokes the word "glow" and a concept of "a glowing smile." (Levine Dec. ¶ 11.) He testified that a user applies a peroxide gel to his or her teeth, which then interacts with the light device to produce a whitening effect. (Feb. 17 Tr. at 211, 217.) At the hearing, Levine testified that he came upon the name "Glo" during a conversation "about how a great smile makes you glow on the inside," and about how his product "was all about reflecting light back into the mouth because nobody has ever built light and heat into a mouth piece that closes the system." (Feb. 16 Tr. at 65.) He also testified that "[w]e liked the acronym of Guided Light Optics and GLO, and when you put the mouth piece in your mouth, it glows ...." (Feb. 16 Tr. at 65.)

Levine's departure from Go SMiLE triggered a series of litigations with Go SMiLE and its parent entities. *GoSMILE Inc. v. Levine,* 09 Civ. 840(LAK) (S.D.N.Y.); *GoSMILE, Inc. v. Levine,* Index No. 601148/09 (N.Y.Sup.Ct.N.Y.Cty.).

On November 16, 2010, Go SMiLE commenced the present action by filing a complaint alleging that the defendants' use of a mark containing the word Glo was confusingly similar to Go SMiLE's trademarks. (Docket # 1.) At a pretrial conference of December 16, 2010, the Court set a discovery schedule in contemplation of the plaintiff's anticipated motion for a preliminary injunction, which was thereafter filed on December 21. (Docket # 27.)

On December 21, 2010, the plaintiff filed its motion for a preliminary injunction, seeking to enjoin the defendants "from marketing or distributing any oral hygiene

---

**1.** The phrase "Go Smile" is capitalized and spaced in a variety of ways throughout the parties' submissions. The Court uses the "Go SMiLE" spelling, which predominates in the plaintiff's memoranda of law.

or teeth whitening products that infringe upon Go SMiLE's statutory or common law trademarks . . . ." (Docket # 28.) A hearing on the plaintiff's motion took place on January 20, February 16 and 17, 2011.[2] The Court heard testimony from Leslie Faust, who is Go SMiLE's CEO and president; Levine; Hal Poret, an expert witness who testified on behalf of defendants as to a consumer survey testing for confusion; and Angela Brass, who identified herself as "the lead sales executive" for Go SMiLE for southern California and Hawaii.[3] The parties declined to consolidate the preliminary injunction hearing with a trial on the merits. (Feb. 16 Tr. at 108–09.)

While the motion was pending, and after the Court denied an application for a Temporary Restraining Order (the "TRO") (Docket # 61), the defendants launched their Glo product line on the Home Shopping Network. In denying the TRO application, the Court noted that the preliminary injunction hearing was "in its early stage" and that the plaintiff had "not yet shown a likelihood of success on the merits . . . ." (Docket # 61.) The Court also noted its authority to craft a remedy directed toward the defendants' sales in the event that the plaintiff ultimately succeeded in its motion for a preliminary injunction. (Docket # 61.)

PRELIMINARY INJUNCTION STANDARD

■ A court may issue a preliminary injunction only if the movant has demonstrated " 'either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in

the [plaintiff]'s favor.' " *Salinger v. Colting,* 607 F.3d 68, 79 (2d Cir.2010) (alteration in original; quoting *NXIVM Corp. v. Ross Inst.,* 364 F.3d 471, 476 (2d Cir. 2004)). The plaintiff also must establish irreparable injury in the absence of an injunction. *Id.* at 79–80.

DISCUSSION

## I. THE PLAINTIFF HAS FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS.

■ To prevail on a trademark infringement and unfair competition claim, a plaintiff must establish that its mark is protected, and also "must prove that the defendant's use of the allegedly infringing mark would likely cause confusion as to the origin or sponsorship of the defendant's goods with plaintiff's goods." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.,* 588 F.3d 97, 114 (2d Cir.2009). There is no dispute that the various Go SMiLE marks are registered with the USPTO and are therefore protected. (Stip. ¶¶ 7–8.)

■ "The crucial issue in an action for trademark infringement' " is whether there is a " 'likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled' " or " 'confused' " as to a product source. *Starbucks Corp.,* 588 F.3d at 114 (quoting *Savin Corp. v. Savin Group,* 391 F.3d 439, 456 (2d Cir. 2004)). " 'The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement.' " *Id.* (quoting *Star Indus., Inc. v. Bacardi & Co. Ltd.,* 412 F.3d 373, 384 (2d Cir.2005)). In *Polaroid Corp. v. Polarad Electronics Corp.,*

---

**2.** The gap between the January and February hearing dates was occasioned by the parties' apparently promising, yet ultimately unsuccessful, efforts at settlement.

**3.** Plaintiff's counsel declined to take the deposition of Levine prior to the hearing, which may partially explain why his testimony occupied more than a day of the hearing. (*See* Feb. 16 Tr. at 109.)

287 F.2d 492, 495 (2d Cir.1961), Judge Friendly, writing for the panel, set forth eight factors to be considered in determining the likelihood of confusion. They are: (1) the strength of the mark; (2) the similarity of the parties' marks; (3) the proximity of the parties' products in the marketplace; (4) the likelihood that the plaintiff will "bridge the gap" between the products; (5) evidence of actual consumer confusion; (6) whether the defendant acted with bad faith in adopting the mark; (7) the defendant's product quality; and (8) consumer sophistication. A court is not "limited to consideration of only these factors." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 118 (2d Cir.2006). No one Polaroid factor is dispositive. *Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 46 (2d Cir.2000).

I now turn to the *Polaroid* factors as they apply to this case.

### 1. *GO SMiLE's Suggestive Marks are of Limited Strength.*

 In determining the strength of the mark, courts look to the mark's "tendency to uniquely identify the source of the product." *Star Indus.*, 412 F.3d at 384. "Ultimately, the strength of the mark turns on its origin-indicating quality, in the eyes of the purchasing public, so that in a given case whether the mark has acquired secondary meaning is a matter which may be relevant and probative and hence useful in determining the likelihood of confusion." *Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 581 (2d Cir.1991) (quotation marks omitted). A mark's strength derives from an "inherent distinctiveness that would entitle it to protection in the absence of secondary meaning." *Star Indus.*, 412 F.3d at 385. In an ascending order of strength, a mark's distinctiveness is classified as generic, descriptive, suggestive, or arbitrary and/or fanciful. *Id.* at 384–85.

 The parties agree that the plaintiff's "Go" marks are suggestive. Suggestive marks "are not directly descriptive, but do suggest a quality or qualities of the product through the use of imagination, thought and perception." *Id.* (internal citation and quotation marks omitted); *see also Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 744 (2d Cir. 1998) (to find a mark suggestive means that "the term 'suggested' the features of the product and required the purchaser to use his or her imagination to figure out the nature of the product."). A suggestive mark is entitled to less protection than an arbitrary or fanciful mark, and the strength of a suggestive mark varies based on surrounding factual context. "In the absence of any showing of secondary meaning, suggestive marks are at best moderately strong." *Star Indus.*, 412 F.3d at 385; *see also Lang*, 949 F.2d at 581 ("suggestiveness is not necessarily dispositive of the issue of the strength of the mark," and the absence of secondary meaning may be relevant and probative).

 In considering whether a suggestive mark has acquired secondary meaning, a court may consider third-party uses of relevant terms, the mark's layout and design, product sales and unpaid publicity surrounding the mark. *Id.*; *accord Medici Classics Prods., LLC v. Medici Group, LLC*, 683 F.Supp.2d 304, 310 (S.D.N.Y. 2010) ("In evaluating secondary meaning, courts typically examine six factors: (1) the senior user's advertising and promotional expenses; (2) consumer studies linking the name to the source; (3) the senior user's sales success; (4) third-party uses and attempts to plagiarize the mark; (5) length and exclusivity of the mark's use; and (6) unsolicited media coverage of the products at issue.") (citing *Thompson Med. Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir.1985)). In *Lang*, the Second Circuit concluded that common third-party use of the words "Choice" and "Choices,"

the "ordinary layout" of the words, total sales of $85,000 and limited marketing and publicity rendered as weak the suggestive mark "New Choices Press." *Id.*; *see also Strange Music, Inc. v. Strange Music, Inc.*, 326 F.Supp.2d 481, 488–90 (S.D.N.Y. 2004) (plaintiff failed to submit probative evidence supporting a secondary meaning of its suggestive mark)

Go SMiLE has submitted some probative evidence going toward a secondary meaning to its suggestive mark. Faust testified that in 2008, Go SMiLE had an advertising budget of approximately $500,000, and that in 2010, its advertising budget was approximately $1 million. (Feb. 17 Tr. at 251–52.) In 2010, Go SMiLE had gross sales of approximately $13 million. (Feb. 17 Tr. at 252.) Go SMiLE retains a public relations firm that sends monthly reports as to Go SMiLE's advertising and marketing presence in print media, on television and online. (Pl. Ex. 167 & 167A.) According to Faust, Go SMiLE's advertising and marketing placements have resulted in consumers being exposed to Go SMiLE hundreds of millions of times, including 150 million exposures to the product in 2010.[4] (Feb. 17 Tr. at 253–54; *see also* Pl. Ex. 167 & 167A.) Moreover, the company was founded in 2002, and, generously assuming that it has sold and marketed its products since formation, the Go SMiLE mark has been in use for approximately nine years. (Pl. Mem. at 17.) In addition, Go SMiLE has submitted evidence indicating that it has actively policed its mark. (Stip. ¶¶ 14–40.) Go SMiLE has disputed, opposed and/or reached settlements with entities attempt-

ing to use marks such as "Go White," "On the Go Essentials," "Glosmiles," "GloWhiteSmiles," "Smiles–2–Go," "ToGoSmile," "Go Touch," "Touch Up & Go," "Glo Whitening," "Go Relaxed" and "Go for Glow." (Stip. ¶¶ 14–40.) Go SMiLE also asserts that while Levine was affiliated with the company, he authorized Go SMiLE's legal counsel to oppose third-party uses of various go-themed marks, and that this is relevant to weighing the mark's strength. (Feb. 16 Tr. at 4–5, 22–23.)

 Go SMiLE's most relevant evidence to the suggestive mark's secondary meaning is the length of time on the market, annual advertising budget and annual sales. *See Lang*, 949 F.2d at 581; *Medici*, 683 F.Supp.2d at 310. Go SMiLE has provided the Court with no guidance as to the overall significance of these sums in relation to an oral care product line—and teeth whitener specifically—that is sold and marketed nationwide. It is unclear from the record whether, relative to the size of the overall market, its advertising budget and overall sales represent a significant, moderate or minimal figure. Nevertheless, Go SMiLE has demonstrated that it has expended a not-insubstantial sum of money in developing awareness among the consuming public. It supports the conclusion that the Go SMiLE brand could be linked to an origin-indicating quality in the minds of consumers. Go SMiLE's evidence concerning the policing of its mark has some probative value, to the extent that it reflects that some third parties have attempted to utilize various combinations of the words "go" and "smile" in reference to oral care products.[5]

---

**4.** Faust described media exposure as "impressions," which refers to "the number of publications or the number of exposures that PR placement would have had to the consumer." (Feb. 17 Tr. at 253.)

**5.** Generally, a senior holder's diligence in policing its mark is relevant to determining

whether the holder has abandoned its mark and thereby permitted it to lapse into the public domain. *See, e.g., Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 110 (2d Cir.2000). The Court is unaware of any authority, and the plaintiff has provided none, that treats the policing of a mark as

 I find that Go SMiLE's advertising and promotional expenses of approximately $1 million per year, its $13 million in annual sales, its nine years on the market and its policing of marks using the words "go" and "smile" together entitle Go SMiLE's suggestive mark to moderate strength.

### 2. The Similarities of the Parties' Marks.

 "In assessing similarity, courts look to the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Star Indus.*, 412 F.3d at 386 (quotation marks omitted). Marks are to be compared to one another as a whole, and not in fragments. *Brennan's, Inc. v. Brennan's Restaurant, LLC*, 360 F.3d 125, 133 (2d Cir.2004). Although "a side-by-side comparison can be a useful" means of investigating marks' similarities and differences, "[c]ourts should keep in mind that in this context the law requires only confusing similarity, not identity," and that consumer confusion is the ultimate issue in weighing the marks' similarities. *Louis Vuitton*, 454 F.3d at 117; *accord Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 539 (2d Cir.2005) ("[C]ourts must evaluate the likely effect on consumers of the marks' similar and dissimilar features *with a focus on market conditions*, even if the products appear to be adequately different in a non-marketplace setting.") (emphasis in original).

I begin by reviewing the side-by-side similarities and differences between the Go SMiLE and Glo marks. I do so in part because this is a useful descriptive exercise, but I am also mindful that in most cases, there would be limited utility to such a comparison. *See Louis Vuitton*,

454 F.3d at 117. In this case, unlike *Louis Vuitton*, the plaintiff has contended that the Go SMiLE and Glo products will often be sold side by side. (Jan. 20 Tr. at 5.) Thus, a side-by-side comparison also has relevance to the "market conditions" in which Go SMiLE and Glo are sold. *See Malletier*, 426 F.3d at 539 (a side-by-side comparison is of limited relevance when products are sold via different stores and websites).

The parties have focused heavily on the similarity between the words "go" and "glo." Indeed, the two single-syllable words begin with a common hard-g sound that is followed by a long-o sound. As the plaintiff has repeatedly observed, there is only a single letter's difference between the words "go" and "glo." The products' packaging is also relevant to the overall impression left on consumers. *Nabisco*, 220 F.3d at 47 (comparing packaging design and shape to weigh risk of confusion over parties' trademarks). Go SMiLE markets a variety of whitening products. (*See, e.g.*, Def. Exs. 109A–K.) Its packaging consists of certain common elements. They often are in an extremely dark, charcoal-type gray, with a blue band circling the package at roughly the bottom-third. (*See, e.g.*, Def. Ex. 109C.) Faust described the blue "as a sky blue or a robin's egg blue." (Jan. 20 Tr. at 13.) Below this blue line is a shaded, black-and-white geometric pattern. (Def. Ex. 109C.) The phrase "GO SMiLE" is depicted in a thin sans serif font of white lettering, with a lowercase "i" and the word "GO" depicted in a distinctive design of all-white, tile-like squares. (*Id.*) Beneath is text reading "SMILE WHITENING SYSTEM," and "Your most brilliant smile in seven easy days." (*Id.*)

The Glo product box, by contrast, is colored in a light-blue fade, with the word

relevant in determining a suggestive mark's secondary meaning. Here, I construe it as indicative of potentially infringing uses and uses by third parties. *Lang*, 949 F.2d at 581.

"glo" prominently displayed in lowercase white letters at the box's center. (Pl. Ex. 262A.) The "g" in "glo" is depicted in a distinct style, similar to a hollowed-out figure 8. (*Id.*) In the upper-left corner, the box's text reads, "GLO Brilliant" and "Personal Teeth Whitening Device." (*Id.*) A second box used by the defendants has a white background, with a prominent semi-circle in a metallic-blue coloring. (Pl. Ex. 262C.) The word "glo" is displayed in metallic blue, using the distinctive "g," and the upper-left corner features blue text reading "GLO | Brilliant" and "Whitening Mouthpiece and Case." (Pl. Ex. 262C.) Levine described the metallic coloring as "irridium." (Feb. 17 Tr. at 205.)

As to the relevant market conditions, much of the testimony involved Go SMiLE's marketing in the Sephora retail chain, which Faust characterized as "a key customer" for Go SMiLE. (Jan. 20 Tr. at 4; Feb. 17 Tr. at 233–41, 249–50, 259, 263–64.) Faust testified that, to her knowledge, Sephora sells Go SMiLE products in all of its stores. (Feb. 17 Tr. at 249.) Levine testified that he expects Glo products to be sold at Sephora, but that he does not expect them to be marketed side-by-side with Go SMiLE. (Feb. 17 Tr. at 204–05, 209–10.) Faust, however, testified that product types are often displayed together, an assertion stipulated to by the defendants. (Jan. 20 Tr. at 5.) At the Sephora stores, Go SMiLE products are often displayed and sold in stand-alone display units colloquially known as "gondolas." (Jan. 20 Tr. at 5; Feb. 17 Tr. at 249.) Go SMiLE previously shared its "gondola" display space with a competing tooth-whitening brand called Bright Smile, with Go SMiLE and Bright Smile each having four shelves. (Feb. 17 Tr. at 249–50.) Faust testified that if Go SMiLE and Glo were to share a "gondola," she anticipated that each would be displayed under its own product heading. (Feb. 17 Tr. at 251.)

Aside from Sephora, Go SMiLE products are sold at other retail stores and on QVC, a cable shopping channel. (Jan. 20 Tr. at 4, 20.) On February 1, 2011, Glo's products were featured for the first time on a competing home shopping channel, HSN. (Feb. 17 Tr. at 208.) Levine testified that he had previously engaged in extensive talks with QVC about selling Glo products on that network. (Feb. 17 Tr. at 205–06.)

Based on the evidence before me, "a focus on the market conditions" of both Go SMiLE and the Glo products would consider instances when the products are marketed in close physical proximity—such as a shared "gondola" at Sephora—and also in separate channels. *See Malletier,* 426 F.3d at 539. In any of these circumstances, the similarity between the parties' marks is minimal.

It is true that, as the plaintiff argues, the words "go" and "glo" have phonetic similarities. But the Go SMiLE products are not marketed under the name "Go," and the defendants do not market a product called "Glo Smile." The products are "Go SMiLE" and "glo," or "glo Brilliant." The plaintiff's atomistic focus on the isolated words "go" and "glo" is contrary to the teachings of *Louis Vuitton,* 454 F.3d at 117, and *Malletier,* 426 F.3d at 539. Moreover, even if the marks had contained identical words while competing head to head, that may, standing alone, still be insufficient to establish similarity. *See, e.g., Nabisco,* 220 F.3d at 46 (the marks of chewing gum products Dentyne Ice and Ice Breakers "are at best marginally similar because of the common use of 'Ice.'"); *W.W.W. Pharmaceutical Co. v. Gillette Co.,* 984 F.2d 567, 573 (2d Cir.1993) (the marks "Right Guard Sport Stick" and "Sportstick" were not confusingly similar as a matter of law because a when a mark is "used in conjunction with a company

name," and the marks' designs vary, the likelihood of confusion is lessened); *Medici*, 683 F.Supp.2d at 311 (design and context of competing marks using the word "Medici" rendered the marks dissimilar).

In this instance, however, the parties' marks employ different words. The word "go" is a common English-language word defined as "to move on a course; pass from point to point or station to station; proceed by any of several means." Webster's Third New International Dictionary Unabridged (2002), at 971. The word connotes mobility and freedom. The word "glo," by contrast, is a colloquial word, undefined in standard dictionaries, including the aforementioned resource and the Oxford English Dictionary. It is a truncated version of the word "glow," and, as Levine testified, is descriptive of the light emitted by his product while in use. (Feb. 16 Tr. at 65.) The concepts evoked by "go" and "glo" are dissimilar.

■■■ In any event, as previously noted, the companies' marks consist of more than the words "go" and "glo." Plaintiff employs the word "go" in connection with the mark "Go SMiLE," as well as certain other go-based phrases. (Sloane Dec. Ex. 3; Stip. ¶¶ 7–8.) On the defendants' packaging, the word "glo" is a prominent stand-alone design element. Moreover, as noted, the defendants' packaging is dominated by light shades of blue, which are depicted with a fading effect. (Pl. Ex. 262A.) The word "glo" employs a distinctive lowercase g. (*Id.*) The blue that predominates the packaging of the Glo products is also in keeping with the bright-blue light that the Glo mouthpiece emits when activated. (Def. Ex. 110.) By contrast, the Go SMiLE packaging is dominated by a very dark gray, with a single blue line toward the bottom of the packaging. The front of the Go SMiLE packaging features a significantly greater amount of text than does the "glo" packaging. (*Compare* Def. Ex. 109C *with* Pl. Ex. 262A.)

■■■ The renderings of the words "GO" and "glo" are visually distinct as well. The plaintiff's mark uses the word "GO" in all-capital letters, whereas the defendants' depict "go" in lowercase. Both words are highly stylized. In the case of "GO," it is depicted in all-white, tile-like squares. Defendants' use of "go" uses a prominent lowercase "g" that is akin to a hollowed-out figure-eight. Stylized letters are protectable, and they are relevant to determining confusion. *See, e.g., Louis Vuitton*, 454 F.3d at 116. In this case, the words' designs are highly distinct from one another. *See Nabisco, Inc.*, 220 F.3d at 47 (when "the parties present their marks in starkly different typefaces and styles," there is a lower likelihood of confusion).

As in *Nabisco*, "[t]he distinctions here are far more than a cumulation of minor differences between the parties' marks, packaging, and product forms ...." *Id.* Whether viewed in close proximity to one another or separately through different vendors over time, the products' overall impressions are dissimilar and would not likely be confused by a purchaser.

### 3. *Proximity of the Parties' Products in the Marketplace.*

The parties agree that their products are in direct competition to one another, and that they may be marketed and sold to the same consumers, and sold in the same or similar marketing channels. (Stipulation ¶ 41.) This factor weighs in favor of the plaintiff.

### 4. *The Likelihood that the Plaintiff Will "Bridge the Gap" Between Products.*

■■■ Where, as here, two products are in direct competition, the "bridging the

gap" factor becomes irrelevant. *Starbucks*, 588 F.3d at 115.

### 5. *Evidence of Actual Consumer Confusion.*

 Actual confusion need not be shown to prevail under the Lanham Act; a plaintiff need only establish that there is a likelihood of confusion as to a mark's source. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir.1986). A survey as to potential consumer confusion may be weighed when considering the likelihood of confusion, and a plaintiff is not to be judged harshly for failing to show actual confusion when a new product is barely on the market. *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir.1987). Evidence of actual confusion weighs most heavily once two marks have been in competition for a substantial period of time. *Lois Sportswear*, 799 F.2d at 875.

In an effort to establish a low likelihood of consumer confusion, defendants have proffered the expert report of Hal Poret, who also testified at the hearing.[6] (Docket # 36; Def. Ex. 184.) Poret has B.S. and M.A. degrees in mathematics, and a law degree from Harvard. (Poret Report Ex. A.) He is a senior vice president of the firm InfoGroup/ORC, and, since 2004, has provided expert testimony in more than 40 federal district court litigations. (Poret Report Ex. A.) In assembling his report, from December 23–29, 2010, five hundred "qualified prospective consumers of tooth whitening products" participated in one of two online surveys designed by Poret. (Poret Report at 5, 27.) The surveys were

double blind: participants were not informed of the survey's purpose or sponsorship, and the firm retained to administer the survey was not told of the study's sponsor or purpose. (Poret Report at 27.) As will be discussed, the surveys found no likelihood of consumer confusion.

### A. *The Eveready Survey Found a Zero Percent Rate of Consumer Confusion.*

The first survey was a so-called "Eveready" survey. (Poret Report at 6–11.)[7] Fifty survey participants were shown an image of the Glo packaging, and a separate image of the Glo light-whitening products in their packaging. (Poret Report at 6–7.) Another fifty were shown an image of the packaging on "GLO Brilliant" whitening gels. (Poret Report at 7–8.) The survey asked participants to "look[ ] at this product" as if they were viewing it on a cable shopping channel such as QVC or HSN, in a store such as Sephora or on a website." (Poret Report at 9.) It then asked all participants: "Do you have an opinion about what company or brand puts out the product you were just shown, or do you not?" (Poret Report at 9.) Respondents who answered "yes" were then asked to identify the brand or company responsible for the product. (Poret Report at 9.) All participants were asked if they knew of any other products marketed by the same company, and if so, the brand and product marketed by that company. (Poret Report at 10.)

All respondents were then asked if they believed that "the company that puts out the product you were shown is affiliated

---

**6.** Plaintiff offered no expert on the issue of consumer confusion. I note that its decision not to proffer an expert was a strategic choice, and not a consequence of the expedited discovery schedule on this motion. The scheduling order of December 16 provided that expert reports would be exchanged on January 4, 2011, with expert depositions permitted by January 11. (Docket # 27.)

**7.** The survey apparently derives its name from *Union Carbide Corp. v. Ever–Ready, Inc.*, 531 F.2d 366, 385 (7th Cir.1976). *See Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F.Supp. 279, 289 n. 10 (S.D.N.Y.1997) (Sand, J.).

with or received approval from any other company or brand that you know of ...?" (Poret Report at 10.) None of the 100 respondents in the Eveready survey named Go SMiLE as a potential source of the Glo product. (Poret Report at 21, 29.) The product was associated with 14 other brands, which were as varied as Sony and Crest. (Poret Report at 29–30.) Four associated Glo with Sephora, but when asked to explain the basis for making the association, responses included that it looked like a product that Sephora would sell, that "it is nice," and, erroneously, that the product said Sephora on the box. (Poret Report at 29 & n. 13.)

### B. *The Sequential Lineup Survey Found a Zero Percent Rate of Consumer Confusion.*

The second survey was a "sequential lineup survey" of 400 respondents, 200 of them assigned to a test cell and 200 to a control cell. (Poret Report at 11.) Respondents were first shown an image of a Go SMiLE product package. (Poret Report at 12–13.) Half saw the packaging of the "GO SMiLE SMILE WHITENING SYSTEM." (Poret Report at 12.) Half saw an image of the "GO SMiLE GO WHITER" product. (Poret Report at 12–13.) As explained in the Poret Report, "The purpose of including two products in the study was to cover two different manners in which consumers could encounter the GOSMILE mark on GOSMILE products." (Poret Report at 13.) Respondents were directed to "take your time looking at this product" and then to continue with the survey. (Poret Report at 13.)

Respondents in the control cell were then shown Glo packaging, with the word "glo" removed, and the product renamed as "Brilliant G." (Poret Report at 14–15.) The control cell alterations were intended to "measure noise—i.e., the extent to which survey respondents will make a connection between the two products even when the GLO marks have been removed." (Poret Report at 20.) Respondents in the test cell were shown images of the original, unaltered Glo packaging. (Poret Report at 14.) Respondents also were shown images of the packaging of other tooth whiteners that presently are on the market. (Poret Report at 15–18.) Respondents were then asked a variety of questions as to whether they perceived the products to be related. (Poret Report at 18–19.)

In the test cell, 37.5% of respondents concluded that the GLO Brilliant product "is put out by the same company as Gosmile" or is otherwise affiliated with Gosmile. (Poret Report at 21.) In the control cell, which did not use "Glo," 38.5% of respondents reached the same conclusions. (Poret Report at 21.) The Poret Report concludes, "Since the Test and Control Cell results were equivalent, the net confusion level is 0%. There was no confusion caused by the GLO or GLO Brilliant mark above the level of survey noise." (Poret Report at 21.)

### C. *The Poret Report is Credible, and Plaintiff's Evidence of Actual Consumer Confusion is Thin.*

 Having reviewed the Poret Report and heard Poret's testimony on the record in open court and subject to cross-examination, I find his testimony to be credible and the surrounding results to be reliable and probative. They support my finding that there is little likelihood of consumer confusion as to the parties' products. In evaluating the sampling methods employed by an expert, a court should consider factors such as whether 1) the population was properly chosen and defined, 2) the sample chosen was representative of that population, 3) the gathered data was accurately reported, and 4) the data was analyzed in a manner consistent with accepted statistical principles. Manu-

al for Complex Litigation (Fourth) § 11.493 (2004). In addition, when considering the validity of a survey, the court should consider whether 1.) the survey questions were clear and not leading, 2.) the survey was conducted by qualified persons, and 3.) the survey was conducted in a manner that ensured objectivity. *Id.*

■ A total of 4661 respondents were screened for participation. (Poret Report at 5 n. 2.) The screening questions were designed to ensure that the 500 selected respondents included only actual and prospective purchasers of tooth whitening products, and also screened them as to their willingness to pay for the products in the applicable price ranges. (Poret Report at 22–25.) Nearly two-thirds of participants had either recently shopped or would consider shopping through QVC, HSN or Sephora. (Poret Report at 24–25.) In its post-hearing letter-brief, the plaintiff argues that the study's sampling is inaccurate, because Go SMiLE's purchasers tend to be mostly female, whereas the Poret survey group was 52 percent female and 48 percent male. As an initial matter, the plaintiffs conclusions as to the demographic of its purchasers were inferred by Faust based on the demographics targeted by the product's vendors; it was not supported by evidence based on market research or other hard data. (Feb. 17 Tr. at 257.) Plaintiff also reviewed "literally maybe a couple days worth of" Go SMiLE's online purchasers "and just by reading the names we decided who might be a man and who might be a woman, but it was nothing formal." (Feb. 17 Tr. at 258.) Such evidence is of limited probative value. Second, and more importantly, as noted, the Poret survey screened out participants who have not purchased, or are not interested in purchasing, teeth-whitening products.

■ Separately, the plaintiff has attempted to set forth incidents of actual consumer confusion. Its evidence is thin, and does not reflect actual confusion on the part of prospective end-users. Rather, plaintiff's evidence is limited to remarks—many of them vague—attributed to employees of Sephora. Brass, an employee of the plaintiff, testified that in March 2010, an employee at a Sephora store "came over to me, quite excited, asking me about the light, wanting to know more about the light." (Feb. 17 Tr. at 234.) Brass did not recall whether the employee mentioned Glo by name. (Feb. 17 Tr. at 235.) A few days later, an employee at a different store inquired about a light device, and called it "Glo." (Feb. 17 Tr. at 235.) By fall of 2010, Go SMiLE was launching its own light-based, tooth-whitening device. (Feb. 17 Tr. at 236, 238.) In or around September 2010, a Sephora employee observed Brass conducting a training session, indicated that "she was quite excited about the light," and asked questions about "the light" as if it were a Go SMiLE product. (Feb. 17 Tr. at 236–38.) Although neither counsel's questions nor Brass's testimony identify the underlying light as Glo, Brass testified that she proceeded to explain to the employee that Glo was not a Go SMiLE product. (Feb. 17 Tr. at 238.) Brass testified that she thereafter had another conversation about "the light" and clarified to another employee that "the other light device" was not a Go SMiLE product. (Feb. 17 Tr. at 238–39.) Again, neither counsel's questions nor the witness's testimony about "the light" referenced a Glo product. (Feb. 17 Tr. at 238–39.)

I found the testimony to be vague, and colored by Brass's interest in helping her present employer; it was of limited probative value. *See Star Indus.*, 412 F.3d at 388 (when evidence of actual confusion "consist[s] entirely of testimony by several interested witnesses recounting a handful of anecdotes, including a number of hear-

say statements by unidentified and unidentifiable declarants," and that same party has failed to offer a consumer survey, evidence of actual confusion is weak); *Lang,* 949 F.2d at 583 (" '[T]rademark infringement protects only against mistaken purchasing decisions and not against confusion generally.' ") (quoting Restatement (Third) of Unfair Competition § 20, reporter's note at 179).

Plaintiff also cites to two e-mails dated February 15, 2011, addressed to Faust by a Go SMiLE employee named Denise Debus. (Pl. Ex. 271.) The subject line reads, "Confusion," and it describes an encounter that Debus had at a Sephora store, where an employee said that Go SMiLE "was changing into new stuff called GLOW and it would be in soon." (*Id.*) Debus notes, "I am confused it's not the same name how could it be the same mfg/brand? ?" (*Id.*) Debus also indicates that a Go SMiLE employee confirmed to her that "GLOW" was not a new brand launched by the company. (*Id.*) Faust testified that the e-mail "was an example of confusion," (Feb. 17 Tr. at 247) but if credited, the e-mail is evidence of confusion on the part of a Go SMiLE employee, who, Faust testified, wrote the e-mail on "her first day of work at GoSmile." (Feb. 17 Tr. at 246.) It is not probative to a likelihood of consumer confusion. *Star Indus.,* 412 F.3d at 388; *Lang,* 949 F.2d at 583.

Plaintiff also cites an e-mail of October 10, 2010, which was produced by defendants and sent to the Practice expressing an interest in purchasing "the at home system ...." (Pl. Ex. 87.) The e-mail states in full, "How can I purchase the at home system, and how much does it cost? What about maintenance ampules? Thanks," followed by the sender's full name. (*Id.*) According to the plaintiff, an ampule is a distinguishing feature of Go SMiLE's products.[8] (Feb. 17 Tr. at 254.) It appears to be Go SMiLE's position that because an e-mail conveyed interest in defendants' product and used the word ampule, the sender had confused Go SMiLE with Glo. This overlooks that ampule is a descriptive English-language word, and that the defendants' product uses sealed vials that resemble ampules. On January 31, 2011, one apparent viewer also e-mailed QVC to state that he was "just amazed" that after QVC "made such a commitment to Go Smile and Dr. Levine" that QVC "let them" appear on HSN. (Pl. Ex. 270.) The e-mail subject line reads, "GLO Teeth Whitening on HSN and Go Smile on QVC from the same dentist!!" (Pl. Ex. 270.) This viewer appears to be cognizant of the difference in the marks used on the products, but confused as to whether Levine was associated with both vendors.

Viewed in its totality, plaintiff's evidence of actual confusion is very weak and of slight probative value. Again, I find the Poret testimony to be credible and reliable. This factor weighs heavily in favor of the defendants.

6. *The Plaintiff Has Not Established Bad Faith by the Defendants.*

 Intentional bad-faith copying of a trademark establishes a presumption that the copier succeeded in causing confusion. *Paddington Corp. v. Attiki Importers & Distributors, Inc.,* 996 F.2d 577, 586–87 (2d Cir.1993) (collecting cases). "Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to

---

8. An ampule (also spelled "ampul" and "ampoule") is "a small bulbous glass vessel hermetically sealed and used to hold a solution for hypodermic injection." Webster's Third New International Dictionary (2002), at 74.

sow confusion between the two companies' products." *Star Indus.*, 412 F.3d at 388. " 'Selection of a mark that reflects the product's characteristics, request for a trademark search and reliance on the advice of counsel are factors that support a finding of good faith.' " *Id.* (quoting *Lang*, 949 F.2d at 583). Prior knowledge of a senior user's mark is not, alone, conclusive evidence of bad faith. *Savin Corp.*, 391 F.3d at 460; *see also Lang*, 949 F.2d at 584 ("adoption of a trademark with actual knowledge of another's prior registration of a very similar mark may be consistent with good faith."). However, "[w]here such prior knowledge is accompanied by similarities so strong that it seems plain that deliberate copying has occurred, [the Second Circuit has] upheld findings of bad faith." *Paddington Corp.*, 996 F.2d at 587.

■ In asserting that the defendants have acted in bad faith, the plaintiff has proffered an *ad hominem* attack on Levine and blasts the credibility of his testimony,[9] but ultimately says little of relevance to *Polaroid*'s treatment of bad faith.

At the time he conceived of the Glo mark, Levine was extremely knowledgeable as to the Go SMiLE marks. (*See, e.g.*, Feb. 16 Tr. at 11–15, 19–20, 24–25.) Levine testified that after leaving Go SMiLE, he performed trademark searches for potential marks including "karma" and "crescendo." (Feb. 16 Tr. at 44.) He did not immediately recall having performed a search for "crescendo," and stated that his search for Karma was performed "for [a] nutraceutical powder" he was developing. (Feb. 16 Tr. at 44.)

The plaintiffs' assertions of bad faith are belied by the underlying dissimilarity between the Go SMiLE marks and the Glo mark, and the descriptive quality of the Glo mark. *Star Indus.*, 412 F.3d at 388.

The dissimilarities between the parties' marks are contrary to a conclusion that Levine's extensive familiarity with the Go SMiLE marks prompted "deliberate copying" by the defendants. *Paddington Corp.*, 996 F.2d at 587.

The plaintiff separately argues that "[d]efendants planned to capitalize on Dr. Levine's name," which is strongly associated with Go SMiLE, and note that, in a January 7, 2009 e-mail, Levine considered touting his past success with Go SMiLE in marketing the Glo products. (Pl. Reply at 24; Sloane Reply Dec. Ex. 16.) The record does not include evidence that Levine has actually cited his past affiliation with Go SMiLE as a basis for promoting Glo.

I find the testimony of Levine to be credible in all material respects. The plaintiff has failed to set forth facts supporting its assertions that the Glo mark was adopted in bad faith.

### 7. *No Relevant, Probative Evidence Has Been Submitted on the Products' Comparative Quality.*

Under this factor, a court "examines whether defendant's products or services are inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse the two." *Morningside Group Ltd. v. Morningside Capital Group, LLC*, 182 F.3d 133, 142 (2d Cir.1999). Conversely, "[a] marked difference in quality, however, actually tends to reduce the likelihood of confusion in the first instance, because buyers will be less likely to assume that the senior user whose product is high-quality will have produced the lesser-quality products of the junior user." *Savin Corp.*, 391 F.3d at 461.

---

**9.** To wit: "We respectfully submit that Dr. Levine's performance on the witness stand revealed him to be an outright liar—one whose testimony should be rejected in its entirety." (Pl. Post–Hearing Letter at 6.)

Plaintiff has attempted to set forth evidence that the defendants' product is of an inferior quality, but the probative value of this evidence is weak. Prior to the defendants' affiliation with HSN, Levine discussed the possibility of selling Glo products through QVC. (*See, e.g.,* Feb. 17 Tr. at 206.) QVC performed quality-control testing prior to selling products on air, and Levine declined to pay a $7,500 charge necessary to test Glo's lip balm product. (Feb. 17 Tr. at 226.) By contrast, Faust testified that Go SMiLE performed "all of the clinical testing required" by QVC, and QVC's "many, many rules and regulations about product submissions." (Jan. 20 Tr. at 29.) Plaintiff characterizes this as "formal testing." (Pl. Post–Hearing Letter Br. at 5.) An e-mail from an employee of a firm called Design Catapult Inc., which consulted with the defendants, also describes "QVC requirements" as "extremely stringent . . . ." (Pl. Ex. 72.) The plaintiff also relies on online reviews for Glo that were posted on the HSN website, and compares them to the online QVC reviews for Go SMiLE. (Pl. Exs. 264 & 267.) "GLO Brilliant Personal Teeth Whitening Device and G–Vials" had an average rating of 3 stars with 32 customer reviews, whereas the "Go Smile Teeth Whitening Device w/6 Whitening Ampoules" had 112 customer reviews, 94 of which recommend the product. (Pl. Ex. 264 & 267.) Separately, the QVC online reviews for Go SMiLE's light-based whitening product average a 47% recommendation rate, with 68 customer reviews. (Pl. Ex. 268.)

Apart from secondhand descriptions of QVC's product-testing requirements, the Court has no basis from which to assess the validity or significance of QVC's testing regime. Without having any basis from which to review or credit its rigors, soundness and relevance, this evidence is of slight probative value. Moreover, Levine's decision not to place the lip balm product into testing at considerable expense does not prove that the product would not have passed the tests.

██ The online product reviews are admissible non-hearsay only for the fact that the online comments were made, and they are not considered for not the truth of their contents. Rule 803(3), Fed. R.Evid. The online reviews have some probative value as to consumer perceptions of the products' quality. If viewed as such, they reflect a negligible difference in consumer perceptions of the two products' relative quality. Given the anonymous nature of the comments, their relatively limited number and the fact that they are not considered for the truth of their contents, the weight afforded to them is slight.

For their part, the defendants' memorandum of law cites defendant Levine's professional reputation as an indicia of Glo's quality. (Opp. Mem. at 19–20.) At the hearing, Levine also testified as to his belief in his own product's efficacy and superiority, stating that Go SMiLE's technology was nine or ten years old. (Feb. 16 Tr. at 101.) I do not consider such evidence to be of significant probative value.

Neither party has offered evidence with significant probative value by which the Court can judge the products' respective quality. This factor favors neither party.

### 8. *Consumer Sophistication.*

An "analysis of consumer sophistication considers the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Star Indus.,* 412 F.3d at 390 (quotation marks omitted). "As the theory goes, the more sophisticated the purchaser, the less likely he or she will be confused by the presence of similar marks in the marketplace." *Savin,* 391 F.3d at 461.

Courts have treated consumers of beauty products as attentive purchasers. *See, e.g., Toni & Guy (USA) Ltd. v. Nature's Therapy, Inc.*, 2006 WL 1153354, at *11 (S.D.N.Y. May 1, 2006) ("While neither party has submitted evidence of the level of consumer sophistication, it would appear that purchasers 'are likely to examine with care' the products they apply to their hair."). Judge Cote has observed that "consumers of cosmetics and in particular purchasers of lipstick, are likely to examine with care the products they apply to their skin and lips." *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, 2006 WL 1012939, at *29 (S.D.N.Y. Apr. 19, 2006); *cf. Giorgio Beverly Hills, Inc. v. Revlon Consumer Prods. Corp.*, 869 F.Supp. 176, 185 (S.D.N.Y.1994) (Duffy, J.) ("[I]t has been acknowledged that women tend to be sophisticated purchasers of perfume .... "). Price also is relevant in weighing consumer sophistication. *See McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1137 (2d Cir.1979); *Toni & Guy*, 2006 WL 1153354, at *11 (collecting cases); *Origins Natural Resources, Inc. v. Kotler*, 2001 WL 492429, at *3 (S.D.N.Y. May 8, 2001) ("upscale, expensive" cosmetic products "will likely be purchased by sophisticated consumers").

The purchasers of Go SMiLE and Glo products are likely to be at least moderately sophisticated. On the HSN website, a pack of Glo's light-based device and G-vials is sold for $320. (Pl. Ex. 264.) Go SMiLE's light-based device is being sold on QVC's website for $153.48. (Pl. Ex. 268.) A consumer's attention is likely to be heightened by the potential for physical sensitivity to the product and the importance of a cosmetic product applied to the mouth. *Cf. Juicy Couture*, 2006 WL 1012939, at *29.

I find that a purchaser of Go SMiLE and Glo products is therefore likely to be attentive to his or her purchases and to note the products' distinguishing characteristics. This factor weighs in favor of the defendants.

### 9. Balancing of Factors.

"In balancing the *Polaroid* factors, 'courts generally should not treat any single factor as dispositive; nor should a court treat the inquiry as a mechanical process by which the party with the greatest number of factors wins. Instead, the court should focus on the ultimate question of whether consumers are likely to be confused.'" *Natural Organics, Inc. v. Nutraceutical Corp.*, 426 F.3d 576, 578 (2d Cir. 2005).

In weighing the *Polaroid* factors, I conclude that the plaintiff has failed to establish a likelihood of consumer confusion. As discussed, defendants' consumer confusion survey found a zero percent rate of confusion when respondents were confronted with images of the competing products. Plaintiff did not successfully impeach the survey's methodology or conclusions, and its purported evidence of actual confusion was, to put it charitably, weak. In evaluating the similarities between the parties' two marks, I find that they left different overall impressions on a prospective consumer, and that a consumer was unlikely to confuse the products' sources, either when viewed together at the same retailer or over time and sequentially through different channels of commerce. In light of the marks' dissimilarities, as well as the Glo mark's descriptive qualities, I find that the plaintiff has failed to establish a bad-faith attempt to design a mark that was difficult to distinguish from Go SMiLE's senior mark. The relative sophistication of these products' consumers, in light of the foregoing, also weighs against finding a likelihood of confusion.

As a result, I find that the plaintiff has failed to establish a risk of consumer con-

fusion, and has therefore failed to prove a probability of success on the merits.

## II. THE DEFENDANTS' MOTION TO STRIKE IS DENIED.

Defendants have separately moved to strike the plaintiff's reply papers in support of its motion, and to preclude Go SMiLE from "using any stolen documents in this action." (Docket # 52.) Defendants contend that the plaintiff's reply papers were filed a day late and exceed the page limit set by the Individual Practices of this Court. The defendants have not plausibly asserted any resulting prejudice.

The motion is also denied to the extent that it seeks to strike "stolen" documents. As was discussed on the record in open court, the defendants contend that Leslie French and Suzanne DellaPella, both of them former employees of the Practice, took proprietary documents related to Glo and provided them to the plaintiff, and did so based on alleged instructions and incentives provided by plaintiff's former law firm, Latham & Watkins LLP. (Feb. 16 Tr. at 58–61.) The Court concluded that the documents were admissible and relevant under the Federal Rules of Evidence, and granted the defendants "permission to take the deposition of these two individuals as well as the attorneys at Latham & Watkins if you want to do that." (Feb. 16 Tr. at 62.) Plaintiff stated that it had no objections to such a route. (Feb. 16 Tr. at 62.) As a result, the Court received the "stolen" documents into evidence, without prejudice to any later motion to strike. (Feb. 16 Tr. at 62.)

The defendants' motion to strike is denied.

## III. THE DEFENDANTS' MOTION TO SEAL IS GRANTED.

Defendants also move to seal certain exhibits annexed to the reply declaration of plaintiff's counsel, Wendi Sloane. Spe-cifically, they contend that Exhibits 12, 14 and 15 of the Sloane Reply Declaration contain trade secrets concerning the costs, development, marketing and distribution of the Glo products. They contend that these items were wrongfully appropriated by Leslie French and Susan DellaPella, as discussed above. The defendants contend that they were double-crossed by plaintiff's counsel, who had promised to permit defense counsel to review the reply submissions and propose redactions prior to filing, but then, at the last minute, filed reply papers and informed the defendants that they would have to pursue sealing by retroactive motion practice. (Bisceglie Dec. ¶¶ 5–6.)

The plaintiff filed no papers in opposition to this motion, and, as of the date of this memorandum and order, it appears that the plaintiff have removed Exhibits 12, 14 and 15 from the publicly viewable docket on the Court's electronic filing system. I nevertheless address, pursuant to *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir.2006), the appropriateness of permitting these materials remain under seal. There is a common law presumption in favor of permitting public access to judicial documents, which are those documents "relevant to the performance of the judicial function and useful in the judicial process." *Id.* at 119. A court balances this common law presumption of access against competing comparisons, including "the privacy interests of those resisting disclosure." *Id.* at 120 (quotation marks omitted). "When litigation requires disclosure of trade secrets, the court may disclose certain materials only to the attorneys involved." *In re New York Times Co. to Unseal Wiretap & Search Warrant Materials*, 577 F.3d 401, 410 n. 4 (2d Cir.2009).

The documents attached at Exhibits 12, 14 and 15 contain highly proprietary

material concerning the defendants' marketing strategies, product development, costs and budgeting. I conclude that the privacy interests of the defendants outweigh the presumption of public access, and that it is appropriate for these materials to remain under seal.

## CONCLUSION

The plaintiff's motion for a preliminary injunction is DENIED. (Docket # 28.) The defendants' motion to strike is DENIED. (Docket # 52.) The defendants' motion to seal is GRANTED. (Docket # 48.) The Clerk is directed to terminate these motions.

SO ORDERED.